WILLIAMS v. WILLIAMS.

1. HUSBAND AND WIFE.

Husbands and wives are equal under the law, in respect to the conjugal affection and society which each owes to the other. The wife may maintain an action for damages against one who wrongfully induces and procures her husband to abandon her or send her away.

2. ULTIMATE FACTS TO BE ALLEGED.

In an action for enticing away a husband or wife, it is sufficient to allege in the complaint the ultimate facts, without a statement of the arts made use of to accomplish the illegal purpose.

3. DECLARATIONS AS EVIDENCE.

In determining whether the declarations of a person not a party are, or are not, competent evidence in a particular case, the nature of the

issue, and the special circumstances under which the declarations were made, must be taken into consideration.

4. DECLARATIONS ACCOMPANYING ACT.

Whenever it is proper to prove the doing of an act by a certain person, the declarations of such person, accompanying the act and having reference thereto, are admissible in evidence as explanatory of the act itself. Thus, in an action by a wife for enticing away her husband, it is proper to admit in evidence the declarations of the husband, having reference to his separation or contemplated separation from his wife, for the purpose of showing what caused such separation, though his mere declarations are not admissible to show what defendant's conduct really was.

5. UNJUSTIFIABLE ACT NOT NECESSARILY MALICIOUS.

In an action for enticing away a husband, an instruction to the effect that *if the conduct of the defendant was unjustifiable, and actually caused the injury complained of, then malice in law is implied from such conduct,* is not technically accurate, as an abstract proposition. Such rule ignores the distinction between the intentional commission of a wrongful act and the doing of a wrongful act through mere error of judgment, and also the distinction between a grievous wrong and a mere nominal trespass.

6. MALICE IN LAW.

In general, malice may be implied whenever there is a deliberate intention to do a grievous wrong without legal justification or excuse. The very essence of malice is a disposition or willingness to do a wrongful act greatly injurious to another.

7. PARENT AND CHILD.

The relation of parent and child may excuse much partiality by one for the other, but such relation does not excuse gross injustice deliberately perpetrated against the rights of others.

8. INSTRUCTION CONTROLLED BY FACTS.

An instruction technically erroneous does not furnish ground for reversal, if the jury are not misled, or if, as a whole, the case is fairly presented to them, and especially if their verdict is obviously correct. In reviewing a charge, it is to be considered as a whole, in reference to the actual matters in controversy. If, when thus considered, it is clear that the jury were not led to a wrong conclusion, the judgment will not be reversed merely on the ground that the charge contains some proposition not technically accurate in the abstract.

9. EXEMPLARY DAMAGES.

In the act restoring exemplary damages, the words, *wrong done to the person* are not restricted to physical or bodily injuries. These words, construed with the entire language of the act, include injuries affecting the mind and sensibilities of the individual.

10. MEASURE OF DAMAGES.

In an action for enticing away a husband or wife, no absolute rule as

to the measure of damages can be laid down. Where the right of recovery is clear the court will not disturb a verdict on the ground that it is too much or too little, unless it is grossly disproportionate to the rights of the parties, as shown by the evidence.

11. EXEMPLARY DAMAGES—PLEADING.

Under the statute providing for exemplary damages, the damages claimed being essentially unliquidated, and there being no definite limit to the exemplary damages allowable, except that they be *reasonable*, the common law practice may be followed in declaring for and awarding such damages.

12. INSTRUCTIONS.

It is not necessarily erroneous for a trial court to omit to charge upon every point of a case, or to omit to give a correct instruction of its own motion upon every point upon which an incorrect instruction is prayed.

*Appeal from the District Court of Arapahoe County.*

ACTION by wife for alienating the affections of her husband and causing him to separate from and desert her; the defendant was the husband's mother. Verdict and judgment for plaintiff in the sum of $12,500. Defendant appeals.

The complaint, omitting the formal parts, is as follows : " On or about the 9th day of July, 1888, in the state of New York, the plaintiff was lawfully married to one Edward L. Williams, who is the son of defendant. That at all times since said marriage the said Edward L. Williams and the plaintiff have been, and now are, husband and wife. That by reason of said marriage the plaintiff became and was entitled to the support, company and society of her said husband. That from and after the time of said marriage, and until the interference on the part of defendant hereinafter set forth, the said Edward L. Williams was deeply attached to his said wife, the plaintiff ; and the plaintiff and her said husband lived happily together as husband and wife, and but for the wrongful and malicious acts of the defendant, hereinafter set forth, would have continued so to live together. That shortly after the said marriage the said defendant, conceiving and harboring an intense dislike of the plaintiff, wrongfully and maliciously sought to prejudice the mind of

said Edward L. Williams against the plaintiff, and alienate his affections from her, and has ever since sought and endeavored, by subtle contrivances, by coaxing and threats of disinheriting the said Edward L. Williams, to entice him to separate himself from the plaintiff, and to leave and desert her. Plaintiff further alleges that on or about the ———— day of ————, 1889, the plaintiff and her said husband were by said defendant persuaded and induced to leave their home, in the state of New York, where they had resided up to said date, and where plaintiff had friends and acquaintances, and to come to the city of Denver, in the state of Colorado, where the plaintiff was an entire stranger. That a few days prior to their said departure from New York the defendant, in pursuance of her said design to alienate the affections of the said Edward L. Williams from the plaintiff, and to entice him to leave the plaintiff, and with a view of having the plaintiff, as well as her said husband, more completely in the power of defendant, fraudulently induced and procured him to turn over and transfer to her, the said defendant, all, or nearly all, of his property, consisting of stocks, bonds, securities, etc., of the value of about twenty-five thousand dollars ($25,000). That shortly after their arrival in Denver the plaintiff and her said husband were joined by the defendant. That said defendant, upon her arrival in Denver, continued, and has at all times since continued, her endeavors to alienate the affections of the said Edward L. Williams from the plaintiff, and to induce and entice him to leave the plaintiff. Plaintiff avers and alleges that said defendant has, by her said arts and contrivances, by threats made to the said Edward L. Williams, and by misrepresenting the plaintiff to him, wrongfully and maliciously alienated the affections of her said husband from the plaintiff, and has wrongfully and maliciously enticed him to separate himself from her, whereby the plaintiff has been deprived of the society, comfort and support of her said husband, by reason of which the plaintiff has been damaged in the sum of fifty thousand dollars ($50,000). Wherefore, plaintiff demands judgment," etc.

The answer admits the marriage of the plaintiff, Kate Williams, with the defendant's son, Edward L. Williams, but denies all the charges of fraud and wrongdoing alleged against defendant.

The statute providing for exemplary damages in certain cases is as follows : " That in all civil actions in which damages shall be assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of shall have been attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings, such jury may, in addition to the actual damages sustained by such party, award him reasonable exemplary damages." Sess. Laws, 1889, p. 64.

Messrs. MORRISON & KOHN and Mr. C. S. THOMAS, for appellant.

Messrs. LIPSCOMB & HODGES, for appellee.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

1. A question is raised *in limine* which goes to the very foundation of this action. The question is whether a wife, *as a matter of law*, can have any right of action against one who induces her husband to abandon and forsake her. It is conceded that the husband may have a right of action against one who entices away his wife ; but it is urged that, by reason of the legal unity of husband and wife, no such right of action exists in her favor. It is true there are some decisions to that effect, but they are neither numerous nor convincing. The case of *Logan v. Logan*, 77 Ind. 558, was rendered by a divided court, two of the five judges dissenting. Subsequently, a contrary opinion was rendered by the same court. See *Haynes v. Nowlin*, 129 Ind. 581. The case of *Van Arnam v. Ayers*, 67 Barb. 544, was expressly overruled in the case of *Bennett v. Bennett*, 116 N. Y. 584. The view urged in behalf of defendant, it is said, logically results from the

doctrine of coverture which, according to the ancient common law, precluded the wife from bringing and maintaining suits in her own name. That doctrine often resulted in the rankest injustice to married women. By sundry legislative acts, dating from an early period, the disabilities of coverture have been gradually removed in Colorado, and these acts have been so liberally construed by the courts that controversies respecting the status of married women have practically disappeared from our jurisprudence. Rev. Stats. 1868, p. 455; Gen. Stats. 1883, secs. 2267, 2268; 2 Mills' An. Stats. 1891, secs. 3008, 3009; Code, sec. 6; *Wells v. Caywood*, 3 Colo. 487; *De Votie v. McGerr*, 15 Colo. 469; *Knight v. Lawrence*, 19 Colo. 425. Mr. Justice Blackstone, who wrote one hundred and fifty years ago, gave as a reason for denying the wife's right of action in cases of this kind the following : " The inferior hath no kind of property in the company, care, or assistance of the superior, as the superior is held to have in those of the inferior, and therefore the inferior can suffer no loss or injury." 3 Bl. Comm. 142. This language seems strange in the present age, however familiar it may have been during the last century. The following from decisions rendered within the last five years show the modern American doctrine upon this subject : In *Warren v. Warren*, 89 Mich. 127, it is said : " The wife is entitled to the society, protection, and support of her husband as certainly, under the law, and by moral right, as he is to her society and services in his household." In *Foot v. Card*, 58 Conn. 1, it is said : " So far forth as the husband is concerned, from time immemorial the law has regarded his right to the conjugal affection and society of his wife as a valuable property, and has compelled the man who has injured it to make compensation. Whatever inequalities of right as to property may result from the marriage contract, husband and wife are equal in rights in one respect, namely, each owes to the other the fullest possible measure of conjugal affection and society. The husband owes to the wife all that the wife owes to him. Upon principle, this right in the wife is equally valuable to her, as

property, as is that of the husband to him. Her right being the same as his in kind, degree, and value, there would seem to be no valid reason why the law should deny to her the redress which it affords to him." A further discussion of this question is unnecessary. We regard it well established, both upon reason and authority, that a wife may maintain an action for damages against one who wrongfully induces and procures her husband to abandon her or send her away. See, in addition to the foregoing, the cases cited in *Bennett v. Bennett, supra;* also, *Seaver v. Adams*, (N. H.) 19 Atl. 776; and *Westlake v. Westlake*, 34 Ohio St. 621.

2. It is contended that the complaint does not state facts sufficient to constitute a cause of action. In an action for enticing away a wife, it has recently been decided by this court that it is sufficient "to allege in the complaint the ultimate facts, without a statement of the arts made use of to accomplish the illegal purpose." See *French v. Deane*, 19 Colo. 504, and the cases there cited. The complaint in this action is sufficient in law, and the evidence was such that this court cannot properly disturb the verdict and judgment, unless it be found that error was committed by the trial court affecting the substantial rights of defendant. From the evidence it appears that plaintiff was married to Edward L. Williams, son of defendant, Elizabeth M. Williams, in the city of New York, in July, 1888. Plaintiff was then about twenty-six years old, her husband being about a year younger than herself. They had been acquainted for some years previous, but their marriage was kept a secret from defendant and her family until the following year, July, 1889. The evidence shows that defendant was much displeased with her son's marriage when she learned of it, and that she sought to bring about a separation of the young people. Failing in this, she prevailed upon them to go west. The evidence further shows that, a few days before they started west, defendant procured a transfer to herself of her son's property, consisting of stocks and bonds of considerable value. Plaintiff and her husband arrived and located in Denver in

August, 1889.   For two or three months thereafter, correspondence was kept up between defendant and her son; and about November 15, 1889, defendant herself arrived in Denver, and took board and lodging at the same house with plaintiff and her husband.   The evidence is undisputed that within a fortnight after defendant's arrival she was actively and persistently endeavoring to secure her son's separation from plaintiff, and in this she was successful.   Early in December she and her son went back to New York together, leaving plaintiff behind, and thus defendant successfully accomplished the separation of the husband and wife.

3. It is claimed that the court erred in admitting in evidence certain declarations made to plaintiff by her husband, against defendant's objections.   The declarations of a person not a party to a suit are not, except under special or peculiar circumstances, competent evidence; such is the general rule.   But in determining whether such declarations are, or are not, admissible in a particular case, the nature of the issue, and the special circumstances under which the declarations were made, must be taken into consideration.   In this case, while the husband of plaintiff was not a party to the suit, yet the action   directly involved not only his mother's conduct, but his own conduct in respect to his wife.   The precise issue was whether defendant had wrongfully and maliciously induced her son to separate himself from and abandon plaintiff, as his wife, thus depriving her of the society, comfort, and support of her husband.   From the character of the issue, therefore, it was not only proper to show the declarations and acts of defendant in respect to her son's marriage, including her efforts to secure a separation of the young married couple, but it was also necessary to show the effect of the mother's conduct upon the son. The state of Edward's mind toward his wife, in consequence of his mother's conduct, and the way in which his mother's conduct caused him to treat his wife, were all involved in the issue.

4. It is a familiar rule that, whenever it is proper to prove

the doing of an act by a certain person, the declarations of such person, accompanying the act and having reference thereto, are admissible in evidence as explanatory of the act itself.  In this case it was shown that defendant took an active part in her son's affairs with reference to his property, his residence, and particularly with reference to his relations to his wife.  It was proper, therefore, that his declarations concerning such conduct on his mother's part, and having reference to his separation or contemplated separation from his wife, should be submitted to the jury, for the purpose of enabling them, in connection with other evidence, to determine the cause or motive which promoted his separation from his wife.  The trial court, in admitting such declarations, expressly limited them to such purpose.  1 Phil. Ev. 185–187; 1 Greenl. Ev., secs. 108, 123; *Baker v. Baker*, 16 Abb. N. C. 302; *Rawson v. Haigh*, 2 Bing. 99–104; *Sessions v. Little*, 9 N. H. 271; *Tenney v. Evans*, 14 N. H. 350.

The evidence unquestionably shows a disposition and effort on the part of defendant to cause a separation between her son and plaintiff, from the time when defendant first learned of their marriage, in July, until their final separation, about the 1st of December of the same year.

A son-in-law of defendant, who lived with her in Brooklyn, was called as a witness for defendant, and, testifying concerning his first meeting with plaintiff, said: " I tried, of course, to shield the family all I could.  I knew this marriage was very distasteful to them, but I talked with her (the plaintiff), and tried to see if there was some way in which the matter could be settled amicably ; but she would not listen to reason, and put forward every objection to every suggestion that I made."   Defendant testified to a conversation between herself and plaintiff at their first meeting, in which plaintiff requested defendant to ask her son if he would not go away with plaintiff and live with her, *as she ( plaintiff ) thought they could get along and be happy.*  Defendant replied: " I told her I would see.  I could not make up my mind then, and she left and went away."   Defendant testi-

fied that shortly afterwards she told plaintiff that, *if she (plaintiff) had a father's house she (plaintiff) should go to it*, and that plaintiff said *she did not know what to do*. Defendant further testified : " I had them (Edward's stocks and bonds) transferred to me—every one of them—myself. I went to each one of the places, and had them made over to me." Defendant testified that she finally made arrangements for her son and plaintiff to go west, and that they did so. Defendant was asked : " What condition of things did you find when you came here (to Denver), so far as the relations of your son and daughter were concerned? A. They seemed to be getting along very well together. I didn't see any-thing amiss,—nothing before me,—until it came up about the little trouble that she would not allow him to go out to play cards ; and we had some little words about it, and I told her what I thought of her, and what she had promised to do when she left Cresson (a place in the east,) and had not done, and that sort of thing, and she got very angry about it." Again, defendant testified : " Well, for a few days we done very well, and went out riding together, and got a horse and buggy, and she drove me around Denver. We went to church together, and everything was very pleasant until this came up about my son's wanting to go to Keeney's and play cards, and she objected. I said (to Edward), 'if you say you want to go, I should go,' and he did go. I said to her (plaintiff) that she made a pretty fool of herself, going to Mr. Keeney's office, demanding the key of my son's desk to get letters out, and she says, 'I will do it again.' I says, ' No, you won't, for you will not get a chance to do it again.' That was the answer I made her. Q. What happened after that ? A. Well, I told her, from the letters I had been get-ting, I thought they better separate ; that I didn't see how they could live together, and live pleasantly ; that they bet-ter be apart. I am sure it would be a great deal better for her, and for him and for me, that they should have a separa-tion. And she said no, she would not have it. I told her that he did not wish to live with her, and there was no law

in the land that could compel a man to live with a woman, if he didn't wish to, as long as he has paid her board. And he never refused to pay her board; always has been willing. And she said I brought her out here to leave her, and I said we hadn't done any such a thing; I would not do that to anybody; that I should pay her way back to New York, or take her to her father's,—either one. And she said she would not go to her father's. I said, ' We will pay your way back to Brooklyn.' And I then offered her a hundred dollars if she would give him a separation, and she said no, she would not. And the reason I offered that was thinking she would accept some sum. If she had said two or three thousand dollars, I would have given it to her, and been done with her right away, but she didn't say she would accept anything. Q. You offered money to get an offer from her? A. Yes, that was the idea. She would not accept it. I told her, all right, she might get her lawyer, and I would get mine, and we would draw up papers for a separation. She got very angry about it. She has a very high temper. So, the next day,—I think it was the next day after this conversation that I went down to Mr. Keeney's office,—I told her to get a lawyer; she had friends to advise her where to go. And she said she had no friends. I told her to go to her boarding house, and they could give her advice what to do. And she started out for a lawyer, and we got our lawyer; and there was a separation talked of, and I said I would allow her three dollars a week after her separation. * * * I offered her $100, thinking she would accept some certain sum. If she had said, I will take a thousand, or two thousand, or three, I would have given it to her. Q. Then that offer of $100 was merely a bait, wasn't it? A. Yes, and she didn't accept it. Then I said, ' I think you better have a separation.' * * * Q. Didn't you say to her that she was hanging around after him was the reason he married her? A. I said I heard she had. Q. She then cried? A. Of course; she can do that any time, you know; throw up her hands and go off in a faint at any time.

Q. You didn't think that was enough to make her cry?
A. No, sir. Q. The proposition of a hundred dollars in exchange for her husband? A. I don't mean that. She could have said what sum she wanted."

The testimony of plaintiff was very strong against defendant, and tended to place defendant in a very unfavorable light, as a disturber and destroyer of plaintiff's conjugal rights. Plaintiff testified that while she and her husband were in Chicago, on their way to Denver, he came to her, and laid his head on her shoulder, and cried, and said, "Kate, ma says I must leave you when we get to Denver." Plaintiff further testified that when they got to Denver they got along very well together, except sometimes when Edward would get a letter from his mother; that Edward said to plaintiff his mother advised her (plaintiff) to go to California, or to her sister's in Nevada; that again he said his mother wished him to come home, as she wanted him to live with her (defendant), and that "I should go to my sister's and remain there, and not go back to New York." Plaintiff also testified that Edward came home one night, and cried all night, and never slept, and kept plaintiff awake also, and said his mother wished plaintiff to go away,—that was about two weeks before his mother arrived,—and Edward said that "I should go to my sister's, and he return home." Plaintiff also testified that, the night before his mother came, her husband laid his head on her shoulder, and cried, and said, "Oh, Kate! mother is coming out to take me away." Plaintiff also testified to the following conversation between herself, her husband, and defendant, as occurring in Denver a short time after the mother's arrival: Plaintiff said to her husband, "'Eddie, Mrs. Thompson is to come to play cards to-night.' He says, 'I am going out to-night.' I says, 'Can't you put it over until to-morrow night?' Mrs. Williams heard me speaking to him, and called him, and says, 'Eddie, what is she saying to you?' and he told her, and she says: 'If you want to go out, you go. If you want to go to the theater, or play cards with the Keeneys, you go and do so. She has

no right to 'interfere with your outside pleasures.' " Plain-tiff further testified that some days after defendant's arrival, she called plaintiff to her room, and said, " 'Now, Kate, I have consulted a lawyer on what we were speaking of last week; and I will give you a hundred dollars if you get Ed-die a divorce, or allow him to get one.' And I would not agree to that, and I says, ' We are living happy, and I don't see why we should separate.' She says, 'If you don't do that, I will give you three dollars to live on, for a separation, and you must take that and live in Denver; otherwise, I will leave you here in Denver, without friends or money. But you must not come back to New York. You can go either to your sister, or remain here, but I don't want to lay eyes on you again.' Then I said my husband hadn't spoken to me about this, and I should see him. She says: ' You can't see him. He may be on the train now, going to the end of the world, where you will never lay eyes on him.' And I cried, and I says, 'I will see him.' And I started down, and she got there ahead of me, and called him out. I says, ' I want to see you in private.' She says, ' No, you can't. Tell him in my presence. I have control of this matter.' And Eddie says, ' Yes, let her speak to me.' And she says, ' No, she cannot.' Also she says that ' I came out here for that purpose, and I am not going back and leave you to-gether.' And I asked to go to New York, where I had friends, and I would have the matter settled there. She says, ' No, I came out here, and whatever business I have to transact, I will do it right here.' " Plaintiff further testified that defendant took her to the office of her lawyers; that defendant's lawyers would have nothing to do with the case unless plaintiff was first represented; that defendant said, " ' Let her go and get a lawyer,' and I said I didn't feel like it, and didn't know where to go and get one; and then I asked my husband to go with me, and she says : ' He can't go. Go alone.' Then defendant's lawyer said, ' Yes, let her husband go with her.' And he did, and on the way I asked him, and says, ' Do you want to separate from me now ? '

He says : ' Well, Kate, you know ma has got all my money, and will not give it to me until I do. But don't you worry, and keep quiet, and when I get it back from her I will come and live with you again.' " That was on the way to the office of plaintiff's lawyers. Plaintiff testified that about that time defendant said to her son, " ' I will leave you right here without a cent ; ' if he would not leave me he should not get one cent of the money ; ' Not one red cent shall he have of it.' " " Q. What did your husband say during that time ? A. Nothing. He sat there, and said not a word at the time." Plaintiff's testimony, as above stated, was not contradicted as to any important matter, except that defendant testified that she offered to pay plaintiff's way back to her father's, and that plaintiff said she would not go to her father's. Other than this, the testimony of the parties was substantially alike, varying only on minor and immaterial points.

Under the issue to be determined, and in connection with the testimony introduced, it was, in our opinion, proper to admit in evidence the declarations of Edward, for the purpose of showing what influenced his conduct in separating from his wife. It is true his mere declarations were not admissible to show what his mother's conduct was, nor was it, *of itself alone*, material how bad his mother's conduct was towards plaintiff ; for, no matter how bad her conduct was, she could not properly be held liable in this action unless the effect of her conduct was such as to cause Edward to become estranged from and desert his wife. From the record it clearly appears that the trial court was careful to place the declarations of the husband upon this ground. Thus limited, it was not error to admit proof of his declarations.

5. The assignments of error on account of instructions given, modified, and refused are numerous, but only one instruction is seriously complained of in argument upon this appeal. It reads as follows :

" The court instructs you that the term ' malice,' as used in these instructions, does not mean such conduct as must

necessarily proceed from a spiteful, malignant, or revengeful disposition, but such conduct as occasioned injury to the plaintiff. If you find from the evidence that the conduct of the defendant was unjustifiable, and actually caused the injury which plaintiff complained of, then malice in law is implied from such conduct."

As an abstract proposition, this instruction is not technically accurate in all respects. By its terms it declares that the conduct of defendant, if unjustifiable and actually injurious to plaintiff, is to be held malicious on the part of defendant. The rule thus stated ignores the distinction between the intentional commission of a wrongful act and the doing of a wrongful act through mere error of judgment, and also the distinction between a grievous wrong and a mere nominal trespass.

6. The term "malice" is variously used, according to the nature of the litigation in which it is sought to be established. In legal parlance, malice may be actual or implied, and in general it may be implied whenever there is a deliberate intention to do a grievous wrong without legal justification or excuse. In civil controversies the very essence of malice is a disposition or willingness to do a wrongful act greatly injurious to another. This idea is not fully conveyed by the instruction as given. 2 Bish. Cr. Law, sec. 429. We are not prepared to say that the foregoing instruction furnishes ground for the reversal of this judgment. The evidence, much of which has been heretofore stated, fully establishes the fact that defendant was intentionally active and persistent in her interference with plaintiff's marital relations. She treated her son and his wife in the most imperious and dictatorial manner. The jury were certainly warranted in finding defendant's conduct grossly unjustifiable. Her conduct being unjustifiable, it was manifestly so willful and deliberate that, as a reasonable person, she must be held to have known that she was thereby committing a grievous wrong to plaintiff without justification or reasonable excuse.

7. It is true the relation of parent and child may some-

times be held to excuse some partiality by one for the other, but such relation does not excuse gross injustice deliberately perpetrated against the rights of others. Besides, Edward was no mere child. He was a man of mature years (25) when he married plaintiff. He married her after an acquaintance of several years. That he married without his mother's consent or knowledge, and kept the marriage a secret from her for a year, furnished no stronger reason for the mother's interference than she would have had if he had married the same person openly. Neither did the mere disparity of a year between the ages of Edward and his wife furnish any ground for the mother to act as though her son had been wrongfully inveigled by undue influence into a marriage with an adventuress. Plaintiff had been a country girl—the daughter of a farmer living about a hundred miles from the city. The evidence discloses no aggravating circumstances to justify the mother in attempting to procure a separation between husband and wife, even though the husband was her own son. The separation of husbands and wives for insufficient causes is a growing evil in this country. It threatens destruction to the family relation, which is the very foundation of civilized society, and the only sure support of good government. The institution of marriage is believed by many to be of Divine origin. The truly good and wise, whatever their religious belief, acknowledge the marriage relation to be in accordance with natural laws, and essential to the preservation and happiness of the human race. It follows that, to avoid the evils arising from the too frequent separation of husbands and wives, the courts, as guardians of the public welfare, should at all times enforce, as far as our laws will permit, the Scriptural injunction, "What, therefore, God hath joined together, let not man put asunder."

8. If the instruction complained of had advised the jury that, to render defendant liable, her conduct must have been intentionally or willfully unjustifiable, it would have been more accurate ; but as the evidence clearly showed that her conduct was not only unjustifiable, but willfully and inten-

tionally so, the instruction does not furnish ground for reversal. *Mackey v. People*, 2 Colo. 13 ; *Dyer v. McPhee*, 6 Colo. 175. It is said by a standard author : "Instructions faulty, or technically erroneous, will not work a reversal of the judgment, if the jury were not misled, or if, as a whole, the case was fairly presented to them, and especially if their verdict is obviously correct." 2 Thomp. Trials, sec. 2401. In *McBride v. Thompson*, 8 Ala. 650, it was held : "A charge to the jury must be considered in reference to the facts in the cause ; and, if thus applied, it is correct, the judgment will ·not be reversed, though, as a *universal proposition*, it may be erroneous."

9. It is assigned for error that the court allowed the jury to award exemplary damages. The cause of action in this case arose after the taking effect of the act restoring exemplary damages. Sess. Laws, 1889, p. 64. But it is insisted that the injury complained of was not *a wrong done to the person* of plaintiff. As we have seen, any one who wrongfully induces a husband to desert and abandon his wife commits an actionable injury against the wife. Such injury is a wrong done to the wife as an individual—as a person. The statute does not specify that the wrong shall be a physical or bodily injury. On the contrary, it allows exemplary damages when "the injury complained of shall be attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings." These words clearly import wrongs and injuries other than mere bodily wounds or pecuniary losses. They include as well injuries affecting the mind and sensibilities of the individual, which are often more grievous and painful than mere material injuries. The whole language of the act, construed together, forbids that the words *wrong done to the person* should be restricted to physical or bodily injuries. In *Bennett v. Bennett, supra*, it is said : "An injury to the person, within the meaning of the law, includes certain acts which do not involve physical contact with the person injured. * * * The Code of Civil Procedure, in defining 'per-

sonal injury,' includes under that head libel, slander, ' or other actionable injury to the person.'"

The court did not err in charging the jury that if they should find from the evidence that the conduct of defendant was attended by circumstances of malice or insult, or showed a wanton and reckless disregard of plaintiff's rights and feelings, then they might, in addition to the actual damages sustained by her, also award her reasonable exemplary damages. The charge, as a whole, fairly presented the issue and the law applicable to the matters in controversy, as disclosed by the evidence. Considering the nature of the evidence, the jury could not have been misled by the instructions as given.

10. The damages were not excessive. Indeed, in one view, they were scarcely more than compensatory. Plaintiff testified that her husband transferred stocks and bonds to his mother, before leaving for the west, of the value of about $25,000. Defendant would not testify positively that these bonds were not of the value of $19,000 or $20,000, but said she did not think they were of that value; that her son owed her $8,000 or $10,000; and that the residue of the property was transferred to her for "safe-keeping." These figures were not controlling as a basis for the verdict, though they were proper to be taken into consideration. In cases of this kind no absolute rule as to the measure of damages can be laid down, and where the right of recovery is clear the court will not disturb a verdict on the ground that it is too much or too little, unless it is grossly disproportionate to the rights of the parties, as shown by the evidence. Wood's Mayne, Dam., secs. 795-798.

The remaining assignments of error require no discussion. The verdict cannot properly be disturbed by an appellate court, and the judgment of the district court is accordingly affirmed.

· *Affirmed.*

ON PETITION FOR REHEARING.

1. It is urged for the first time upon this application for a

rehearing that exemplary damages are not recoverable in this. action, because not specially declared for.   The argument is that in this state, since the decision of *Murphy v. Hobbs*, 7 Colo. 541, exemplary damages are not allowable except upon statutory authority, and that statutory damages must always be specially declared for.   Where a statute expressly provides for the recovery of damages equal to twice or three times the actual damages, as in case of waste, or wrongful levy upon exempt property, the better practice is to declare specially upon the statute for the statutory damages.   In such case the value of the property furnishes a definite standard by which the damages may be measured.   But where the damages claimed are essentially unliquidated, as in case of injury to the character, rights, or feelings of another, and the statute does not specify any definite limit to the exemplary damages allowable, except that they be *reasonable*, the common law practice may be followed in declaring for and awarding such damages.   Thus tested the complaint· states facts sufficient in substance to support a verdict for exemplary damages.   Moreover, while the complaint does not contain the precise statutory words upon which exemplary damages are allowable, it does contain words of like import.   *Race v. Oldridge*, 90 Ill. 250 ; *Reed v. Northfield*, 13 Pick. 94 ; *Day v. Woodworth*, 13 How. 369 ; *Wymond v. Amsbury*, 2 Colo. 213 ; *Hallack v. Stockdale*, 14 Colo. 198.

2. It is further urged that the trial court refused to give to the jury the following instruction : " The court instructs the jury that the plaintiff must prove her entire case by legal evidence, and that the admissions of her husband, made to her and testified to by her, they will entirely disregard in considering their verdict."   This request to charge was contrary to the law applicable to the issues and the evidence, as ruled at the trial.   See former opinion.   If defendant desired a written instruction in accordance with the oral ruling of the trial court, specifying the purpose for which the husband's declarations to his wife were competent as evidence, such instruction should have been requested at the proper time.   We

cannot accede to the view that it is necessarily erroneous for a trial court to omit to charge upon every point of a case, or to omit to give a correct instruction of its own motion upon every point upon which an incorrect instruction is prayed. Few trial records could stand such a test. It is true the code provides that "the court shall give such instructions upon the law to the jury as may be necessary;" but it is evident that this was not intended to supersede the diligence of parties or their counsel, since the same section also provides the manner in which parties shall prepare such special instructions as they may desire to have given. Code, sec. 187. In the present case it is evident the jury understood the purpose for which the declarations of the husband were admitted, and that no special instruction upon that point was really necessary.

3. It is earnestly insisted that this is not a case where a verdict should be upheld upon the evidence notwithstanding an erroneous instruction; and in this case it is again urged that it was inconsistent for the wife to commence suit against the mother-in-law, charging her with causing the husband's abandonment and desertion, and at the same time to commence a suit against the husband, charging him with cruelty. This argument has but little force. The evidence shows the mother to have been grossly in fault for causing her son to abandon and forsake his wife, but this misconduct did not necessarily excuse the son for yielding to his mother's dictation. The divorce case was reviewed by the court of appeals. See *Williams v. Williams*, 1 Colo. App. 284, where Mr. Justice Bissell, speaking of the identical transactions involved in this case, uses the following language : " It would be an idle thing to detail what took place after his mother, Mrs. Williams, arrived in Denver. It was a cruel, bitter, unholy persecution. A weak, vacillating, purposeless son was controlled by a dominating woman, to the end that the tie which bound him might be severed." These remarks of the learned judge were not called to our attention until our former opinion was announced, but they fully confirm the view we then

expressed.   Upon further consideration of the evidence and circumstances of the case, we feel constrained to say that the jury were bound, under the evidence, to find a verdict in favor of plaintiff.   Moreover, the evidence, without substantial conflict, shows defendant's conduct to have been, not only grossly unjustifiable, but willfully and intentionally so. It certainly shows on the part of defendant *a wanton and reckless disregard of plaintiff's rights and feelings*, and thus fully establishes the foundation for exemplary damages under the statute.   See *French v. Deane*, 19 Colo. 504.   The verdict is obviously correct; and though the instruction complained of is erroneous, as an abstract proposition of law, it should not, as was said in our former opinion, work a reversal of the judgment.

The remaining matters urged in favor of a rehearing require no discussion.   The petition must be denied.

*Rehearing Denied.*