[No. 4963.]

## GILBREATH v. GILBREATH.

1. **Appellate Practice—Verdict—When Disturbed—General Rule and Exceptions.**

The general rule that a verdict will not be disturbed on review, applies where there is a substantial conflict in competent testimony bearing on the issues which it is the province of the jury to determine, and it does not apply where the verdict is so manifestly against the weight of the testimony that it must have been the result of passion or prejudice, or where there is no testimony whatever to support the verdict.—P. 7.

2. **Practice in Civil Actions—Husband and Wife—Alienation of Affections—Evidence.**

In an action against a father-in-law for alienation of the affections of a husband, alleged statements of the husband that his father did not want him to live with the plaintiff, and that he was going to leave her, and a letter from the husband to plaintiff's attorney stating that he had come to his senses, that he was going to live with his wife, and wanted to right the wrongs he had done her, are not competent to show interference by the father, but only admissible to show the effect of such

interference, if any was shown, with respect to the causes which prompted the son to separate from her.—Pp. 9, 15.

**3. Same.**

In an action against a father-in-law for the alienation of a husband's affections, evidence that defendant employed counsel to defend the husband in an action for separate maintenance is not admissible, in the absence of a showing that the defendant interfered in their married affairs; but, if there was evidence of such interference, the employment of counsel might be regarded as tending to prove the allegations in the complaint. —P. 16.

**4. Same—Sufficiency of Evidence.**

In an action for alienating the affections of plaintiff's husband, evidence reviewed and held insufficient to sustain a verdict for plaintiff.—P. 17.

**5. Appellate Practice—Assignments of Error—Not Included in Abstract.**

Although the usual practice is to include the assignments of error in the abstract, it is a sufficient compliance with rule 11 of the supreme court, requiring an appellant to assign errors in writing at the time of filing the transcript of record, to include such assignments in the opening brief of counsel filed in the case.—P. 17.

*Appeal from the District Court of Rio Grande County.*

*Hon. Chas. C. Holbrook, Judge.*

Action by Edna J. Gilbreath against J. C. Gilbreath and H. H. Abbott. From a judgment for plaintiff, J. C. Gilbreath appeals.

*Reversed and remanded.*

Mr. IRA J. BLOOMFIELD, for appellant.

Messrs. RICHARDSON & HAWKINS, for appellee.

Mr. JUSTICE GABBERT delivered the opinion of the court:

Appellee, plaintiff below, brought suit against appellant, J. C. Gilbreath, and his brother-in-law, Dr. H. H. Abbott, to recover damages for alienation

of the affections of her husband, William Irwin Gilbreath. The case was submitted to a jury. A verdict was returned, assessing damages against appellant in the sum of four thousand dollars, and against his co-defendant, Dr. Abbott, for five hundred dollars, as exemplary damages. Plaintiff entered a *nolle prosequi* as to Dr. Abbott, and the verdict was set aside as to him. Judgment was rendered against J. C. Gilbreath, from which he appeals.

The errors assigned relate to the reception of testimony, instructions, and insufficiency of the testimony to support the verdict against appellant. It is only necessary to consider the latter question.

The general rule is, that the verdict of a jury will not be disturbed on review, but this rule only applies where there is a substantial conflict in competent testimony bearing on the issues which it is the province of the jury to determine. To this rule there are several exceptions, as where it appears that the verdict is so manifestly against the weight of the testimony that it must have been the result of passion or prejudice, or where there is no testimony whatever to support the verdict. This case falls within the latter exception. Perhaps it would be sufficient to briefly state that there is absolutely no testimony to sustain the finding of the jury, that the appellant was in any manner responsible for the separation of plaintiff and her husband or did anything whatever to alienate the affections of her husband, or to prevent the husband and wife from living together; but a review of the testimony will demonstrate beyond question that the contention of counsel for appellant that the testimony wholly fails to prove any facts which would justify a verdict against him, is correct.

Appellant is the father of William Irwin Gilbreath, and his co-defendant, Dr. Abbott, the uncle

of Irwin by marriage. Plaintiff and her husband first became acquainted in 1896 or 1897. At that time plaintiff was residing with the family of Dr. Abbott, who then lived in Missouri, and was engaged in teaching school. Her husband was working in Chicago, and first met plaintiff at the residence of the doctor. At that time he was about eighteen or nineteen years of age, and plaintiff a year or so older. It appears that he began paying her some attention at this time, and also at other times when he visited his parents, who lived in the same town that Dr. Abbott did; and that they corresponded to some extent while he was in Chicago. In 1899 plaintiff went to Chicago to attend school, where she again met the young man. She did not remain long, but returned to Missouri. The correspondence between the young people ceased, and they did not meet again for about two years. In the spring of 1901 Irwin removed to Colorado. At that time Dr. Abbott and his family were living in the town of Monte Vista. Irwin engaged in business on his own account, and in looking after stock for his father and uncle, Dr. Abbott, and another relative, a Mr. Gates. Much of his time was put in at their cattle camp, located some distance above Creede. A few weeks after he came to Colorado, plaintiff also came to Monte Vista, and took up her residence with the family of Dr. Abbott. The young people resumed their acquaintance, and William Irwin Gilbreath called on plaintiff several times. She states that her purpose in coming to Colorado was to secure a school, which she finally did. The school house was located about a mile and a half from Monte Vista. She commenced teaching in September after her arrival, and down to about the first of January continued to reside with the family of Dr. Abbott. At that time, on account of the weather, she took up her residence near the school house. William Irwin Gil-

breath continued to call upon her, and on the first of
March, 1902, they were secretly married at Alamosa.
It was agreed between the young people that they
would keep their marriage secret for a year, unless
for good reasons it should be necessary to make it
known sooner, and no one in the vicinity of Monte
Vista was informed of their relation except the lady
where plaintiff was boarding.  The reason plaintiff
assigns for not having made their marriage public is,
that she thought that she could not retain her school
if it was known she was a married woman.

.The family of plaintiff's husband had no objec-
tion to her.  Previous to coming to Colorado, she
had lived in the family of Dr. Abbott something like
three years, and they held her in high esteem.  Her
husband's parents seem to have known her quite well,
and appear to have encouraged his attentions to her.
The marriage being kept secret, the husband contin-
ued to conduct himself as an unmarried man.  This
angered the plaintiff, and was the cause of quarrels
between herself and her husband.  According to the
testimony of plaintiff, the first intimation she had
that her husband's father was in any way opposed
to her, is placed as of date April 23rd, subsequent
to the marriage.  On this date the defendant Gil-
breath arrived at Monte Vista with the intention of
making that place his home.  She says that her hus-
band stated to her at this time that he was not going
to live with her; that his folks had talked with him;
that his father had heard of their marriage in Mis-
souri and did not want him to live with her, and that
he was going to leave her.  This testimony could not
be considered for the purpose of establishing the
fact that the father had endeavored to prevent his
son living with plaintiff, but was only competent for
the purpose of showing what the effect of the father's
interference (if any was shown) was upon the son

with respect to the cause which prompted him to separate from his wife.—*Williams v. Williams*, 20 Colo. 51. However, we think she is mistaken in her statement that her husband ever made a declaration to the effect that he was going to leave her because of any conversation had with his father or any of his people. His postoffice address, when at the cattle camp, was San Juan, and it appears that about this date the plaintiff wrote her husband two letters, addressed to him at San Juan, one dated April 22nd, mailed at Monte Vista April 23rd, and received at San Juan April 24th; and another, written on April 27th, and mailed on the next day. Then, again, on May 14th, 1902, she wrote a long letter to her husband, addressed to him at San Juan. In this letter there is not a single word from which it can be inferred that their troubles were in any manner caused by anything which the husband's father or his co-defendant, Dr. Abbott, may have said to him. On the contrary, it is apparent from the letter that their difficulties arose from entirely different causes. It is certainly strange, to say the least, that if the estrangement of her husband was caused by any influence of his father prior to the date she wrote this letter, that she said nothing about it.

About two weeks later she wrote another long letter to her husband in which she upbraids him for his alleged misconduct, but nowhere intimates that his father is exerting any influence to have him leave her. Plaintiff says that defendant Gilbreath told her that she should not have made any effort to see her husband, and that he had told his son not to go to see her. This conversation took place some time after the 24th of May, 1902; but, as stated by plaintiff, is misleading and only partially conveys the truth. Plaintiff's belief that her husband was paying attention to other women preyed upon her mind to

such an extent that she determined to have a talk with Dr. Abbott on the subject. Accordingly we find that about the middle of May, 1902, as stated by Dr. Abbott, and not disputed, she talked with the doctor. She exhibited to him their marriage certificate, and this was the first intimation he had of the marriage. She told him about her husband's conduct, their trouble, and her desire to effect a reconciliation, and asked his advice. Not a word did she say about her husband's father having influenced her husband not to live with her. At this time she charged her husband with being guilty of stealing cattle in which the doctor was interested, and spending the proceeds for immoral purposes. He stated to her that he did not believe the charge, and suggested that if she talked in that way, it would anger her husband, and probably prevent their getting together, and likewise prevent him (the doctor) and her husband's people from effecting a reconciliation between them. He also advised her to keep quiet for the present. It was agreed that nothing should be said about their marriage to any other person at that time. Later he obtained her consent to talk with her husband's father about the matter, and did so. In the meantime plaintiff learned that her husband intended to attend public school exercises at the high school in Monte Vista in company with a young lady, and she caused a notice to be served upon her that she was married to William Irwin Gilbreath. The doctor advised her not to do so, because it would but serve to widen the breach between her husband and herself. On May 24th, 1902, according to her own statements, she visited the elder Mr. Gilbreath, the defendant, and informed him of her marriage with his son, exhibited their marriage certificate, said that he had been guilty of stealing cattle and was using the money for improper purposes; that she would not stand his con-

duct any longer, and sought advice of him. She does not claim that she said a word to the defendant indicating that he was in any manner responsible for her troubles; but, on the contrary, indicated that her trouble was caused entirely by the misconduct of her husband. According to her own statements, the defendant treated her kindly, said that if she and his son were married they ought to live together; that he would try and induce him to do so, and that if they did, he would furnish them a comfortable home; but advised her to stop talking about her husband the way she was, as it would certainly anger him, and that he would see his son and use his influence to induce him to treat her as a wife should be treated. In this connection, as stated by her in substance on cross-examination, she said that she would live with her husband if he did right, but would not if he continued going with other women.

Shortly after this conversation her husband visited his father. The latter told him what plaintiff had said regarding his conduct. This angered the young man, and he said that he would at once go and talk with his wife about these charges. The father advised him not to go and see her when angry. Later, the defendant Gilbreath had a conversation with plaintiff, at which time he told her that the charges she made against her husband had angered him, and advised her not to see him while he was in that frame of mind. It appears she attempted to see her husband at the cattle camp, and when defendant Gilbreath learned of this, he told her that he thought it was unwise for her to see her husband while they were angered at each other. This fully explains the statements made by plaintiff, to the effect that the defendant had told her that she should not have made any effort to see her husband, and that he had told him not to go to see her.

About two weeks after her first conversation with the defendant Gilbreath, she again called upon him, and wanted to know if she had told him that Irwin was guilty of the conduct she charged. He answered her that she did, to which she replied: "I want to apologize to you for saying that," and wanted to know if he had told her husband. Defendant said he had. She then said: "I have concluded to live with him, and will drop all this fuss," to which the defendant replied: "That is the best thing you can do. I have thought that all the time; you were both mad; I knew that he was, and I think you was." The plaintiff answered that she was angered, and defendant, continuing, stated in substance that he would go up to see his son, and would do the best he could towards bringing about a reconciliation.

Subsequently the father visited his son at their cattle camp above Creede, and on his return, in company with Dr. Abbott, visited the plaintiff and had a talk with her in relation to the trouble between her husband and herself. After this conversation she wrote a letter to her husband, and also to the defendant Gilbreath, inclosing a copy of that letter. From these letters it is apparent that plaintiff never once thought that the trouble between herself and husband was caused by any interference on the part of his father or co-defendant, Dr. Abbott; but, on the contrary, appreciated the efforts made by the father to induce his son to live with her, and that their trouble resulted from other causes.

It also appears from the testimony that about this time plaintiff called on Mr. Veerkamp several times in company with Dr. Abbott. According to the statements of Mr. Veerkamp, she never claimed that the defendant Gilbreath was the cause of the trouble between herself and her husband. Mr. Veer-

kamp also stated that the doctor treated her kindly, and was endeavoring to bring about a reconciliation.

In addition to this, there is testimony of several other witnesses, members or friends of the family of her husband, who give the substance of conversations had with her or in their hearing, on or about the date she first visited the defendant Gilbreath. From this testimony it appears that her entire complaint againt her husband was based upon the fact that she believed he was leading an immoral life, and that she would not live with him until he changed his conduct in this respect.

In the summer of 1902 plaintiff went east, and it might be inferred from some of her statements that this trip was made at the instance of the defendant Gilbreath, with a view of keeping the young people apart. There is no foundation for this claim, because it appears from the testimony that plaintiff had made up her mind to make this trip, of her own volition had talked with her father-in-law about it, and from a letter written by her to him before she went east it seems that this trip had been arranged by the young people prior to their marriage. Defendant probably said something to her to the effect that her husband would visit her while in Missouri. He did not do so, but there is nothing in the record from which it could be inferred that any influence on the part of his father prevented him from doing so. After her return she brought suit against her husband for separate maintenance, and states that on the trial of this matter, the defendants appeared and defended the cause on the part of the son. This, again, is a misleading statement, because it is shown that their attendance was not voluntary. They were subpœnaed by the plaintiff, and this accounts for their presence in court when the action against her husband was tried. At this hearing an affidavit made

by the defendant Gilbreath and one by her husband were filed. They contained statements which ought not to have been made, but there is nothing in either affidavit from which it could be inferred that the defendant Gilbreath had been instrumental in causing the young people to separate.

It is also claimed on the part of the plaintiff that the defendant Gilbreath employed counsel to represent the son. He did, but it was at the request of the son. He states in his affidavit that he had become responsible for such counsel fees because his son had no money.

On the trial of the case at bar a letter of the husband, addressed to counsel for plaintiff, was introduced, in which he states that he had come to his senses, was going to live with his wife, that he had had a talk with her, that she was willing to live with him, and he wanted to right the wrongs that he had done her. This letter could only be competent for the purpose indicated in *Williams v. Williams, supra.* It could not be considered in determining whether his father had exerted any influence to keep him away from his wife, even if it contained any statements to that effect, which it does not.

This, in brief, is a synopsis of the testimony upon which the case was submitted to the jury, and, as previously stated, there is absolutely none tending to prove the allegations of the complaint against the defendant Gilbreath, or his co-defendant, Dr. Abbott. Even if, in a case of this kind, conjecture could be resorted to by a jury in determining the issues between the parties, there is not sufficient upon which to base a surmise that the defendant had been instrumental in the slightest degree in causing the plaintiff's husband to desert her. As previously noticed, she does not claim that in any conversation she had with either of the defendants, she stated

that they were exerting any influence over her husband to prevent him from returning to her. She admits that they treated her with the utmost kindness and consideration. It appears that they endeavored in good faith to bring about a reconciliation between the husband and wife; that they never attempted to keep them apart save and except that the defendant Gilbreath told his son he should not attempt to see his wife when angered, as he was, over the charges she had made against him, and had likewise stated to plaintiff that he did not believe it was best she should attempt to see him when angered, for the same reason.

The employment of counsel by defendant was not improper, in view of the fact that the relationship was that of father and son. If there was some evidence tending to prove that the father was guilty, as charged, the fact that he employed counsel for his son and became responsible therefor might possibly be regarded as a circumstance tending to prove the allegations of the complaint. Standing alone, as it does, it is not. The relation of father and son might well be regarded as sufficient to prompt him to assist in defending an action by the wife against her husband, where it appeared, as it does, that the son had little or no property; nor is the fact that defendant Gilbreath may have employed such counsel while he was endeavoring to effect a reconciliation between plaintiff and her husband of any particular moment when it was doubtful, because of plaintiff's attitude, whether such a reconciliation would be brought about.

The trip east was made by plaintiff of her own volition, pursuant to an arrangement with her husband before marriage, and the fact that her husband did not visit her while she was in Missouri cannot be attributed to any action on the part of the defend-

ants, in the absence of testimony showing that they had used any influence to prevent him from doing so.

The letter of the husband to counsel for plaintiff can only be considered for the purpose indicated; and however much we might be inclined to criticise statements in the affidavits filed at the hearing of the action of plaintiff against her husband, they do not tend to prove that the defendant Gilbreath, or Dr. Abbott, were responsible for the separation. The record may disclose that the husband has treated the wife badly, and has deserted her without cause; but, however that may be, the law will not permit the plaintiff to recover for these wrongs from those who are in no manner responsible therefor.

It is suggested by counsel for plaintiff that this appeal should not be considered because the abstract of record is unfair and untrue, and does not contain an assignment of errors. We cannot agree with the claim that the abstract filed by counsel for appellant is incomplete or unfair. On behalf of the appellee a supplemental abstract of 91 pages has been filed. From an examination of this abstract it does not appear that the abstract filed by appellant omitted any substantial part of the record. The one filed by appellee states the testimony more in detail, but an examination of this only strengthens the contention of counsel for appellant, that the testimony was insufficient to sustain the verdict returned by the jury.

Rule 11 of this court requires the appellant to assign errors in writing at the time of filing the transcript of record. This rule was complied with in the case at bar. The practice is to include such assignments in the abstract of record, but a failure to do so is not fatal to a consideration of the appeal, when, as in this instance, the assignments of error are included in the opening brief of counsel for ap-

pellant. Being so included, they are before us for consideration, without resort to the original transcript; so that the rule adopted by this court and the court of appeals, that in the examination and consideration of a case the court will not resort to the record on behalf of the party who prepared the abstract to determine an assignment of error, or to consider matters which should appear in the abstract or briefs, has not been violated.

The judgment of the district court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

CHIEF JUSTICE STEELE and Mr. JUSTICE CAMPBELL concur.