## No. 13,915.

### LUDLOW *v.* LUDLOW.
(67 P. [2d] 501)

Decided April 19, 1937.

Messrs. WOLVINGTON & WORMWOOD, Mr. FRED W. STOVER, Mr. HERBERT A. ALPERT, for plaintiffs in error.

Mr. P. D. NELSON, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE BURKE delivered the opinion of the court.

PLAINTIFFS in error are hereinafter referred to as Mr. and Mrs. Ludlow respectively, and their deceased son as Myron. Defendant in error, Ruth Ludlow, is referred to as Ruth, her father and next friend as Mr. Cavender, and his wife as Mrs. Cavender. At the time of the death of Myron he and Ruth were husband and wife, but separated. She had sued for separate maintenance and he had counterclaimed for divorce.

Ruth brought this suit against the Ludlows for damages for the alienation of the affections of Myron. On a verdict in her favor for $4,400 judgment was entered. To review that judgment this writ is prosecuted. Of the fourteen assignments of error some go to rulings on motions for nonsuit, directed verdict, judgment, arrest of judgment, and new trial. All these rest primarily on the question of the sufficiency of the evidence. Others go to admissions of evidence and refusal to strike it. The last questions the correctness of instruction No. 11.

Ruth and Myron, then aged fifteen and twenty-two respectively, began keeping company in 1932. They were secretly engaged in 1933 and the engagement was broken in July of that year. October 7, 1933, Myron moved from the home of his parents to the Johnson apartments and December 5, following, the parties were married. The marriage was kept secret, Myron continuing to reside at the apartments and Ruth at the home of her parents.

January 30, 1934, the Ludlows first learned of the marriage and June, following, Ruth came to live with her husband in his apartment. December 15, 1934, they finally separated and about three weeks later Ruth filed suit for separate maintenance and this suit for alienation. In the former Myron counterclaimed for divorce. That case was set for trial March 21, 1935. March 19, 1935, Myron took his own life. Trial of the present action began October 1 following.

There are more than a thousand folios of the record before us and the case is extensively and skillfully briefed with the citation and careful examination of numerous authorities relied upon by counsel. We give little attention to the law of the case for the very good reason that of the nineteen instructions given one only is assigned as error and we assume, without deciding, that it was correct. Our conclusion is that the evidence was insufficient to support the verdict and that motion for nonsuit should have been granted.

The court's instruction No. 3 reads: ''Unless you find from a preponderance of the evidence that is direct and substantial, that the alleged acts complained of by plaintiff were committed by defendants intentionally, willfully and maliciously for the purpose of alienating their son's affections from plaintiff and did in fact cause a separation, then your verdict must be for the defendants.''

Instruction No. 5, given, reads: ''There is testimony in this case as to declarations and statements purported to have been made by Myron B. Ludlow, now deceased, which are not admissible in this case for any purpose except to show his state of mind, if any, at the time of the alleged separation of Myron B. Ludlow and the plaintiff, and unless you find in this case from a preponderance of other evidence which is direct and substantial, that the defendants intentionally and maliciously caused the separation between the plaintiff and her husband, your verdict must be for the defendants.''

Instruction No. 10, given, reads: "You are instructed that parents have a legal right to oppose and prevent the prospective marriage of their son, whether acting in good faith or otherwise, and any evidence in this case concerning the acts or conduct of or on the part of the defendants prior to their actual knowledge of the marriage of plaintiff and defendants' son, should be disregarded by you in arriving at your verdict."

Tested by this law we find no direct and substantial evidence that defendants "intentionally, willfully and maliciously for the purpose of alienating their son's affections from plaintiff" did or said anything which could reasonably bring about that result. It is admitted that Myron worked for his father who, after the marriage, raised his wages; that on the invitation of the Ludlows Myron and his wife went to their mountain cabin for a vacation; that after Ruth claims to have overheard Mrs. Ludlow say "she just couldn't stand me any longer" (which is the strongest support for the verdict in this record) Ruth was at least four times invited to the Ludlow home; that Myron was so far out of the control of his parents that he left their home and went to the Johnson apartments because they objected to his staying out late at night, and particularly with Ruth; that after friction had arisen between Myron and his wife and it was arranged between their parents that each should return to the parental roof, Myron went back to the apartment and took up his abode with Ruth; that Ruth was the first to consult counsel about a divorce; that while she was in his office for that purpose Myron came and took her away with the assertion, "Ruth is my wife and I am going to live with her and I am going to take care of her"; that Mrs. Ludlow said in their presence that she hoped they could get along and that she would do everything she could to help; that after their marriage Ruth's parents wanted her to get it annulled; that difficulties between the parties reached a stage where they had slapped each other, and Ruth charged her husband with lying to her;

that every time Ruth met Mr. or Mrs. Ludlow they were kind and pleasant to her; neither ever told her they didn't like her; that her parents wanted her to get a divorce; that Ruth and Mrs. Ludlow met at a party and played cards together at the same table in the fall of 1934 and Mrs. Ludlow was friendly; that on his death Myron left two notes both apparently intended for his parents, and one addressed to them. Therein he asserts that they are not responsible for the trouble but "I left Ruth because we just could not hit it off * * * My mother and dad are not to blame." "I absolutely not stand by and see my mother and dad suffer and have to pay money that they saved for, for something which they are entirely innocent of." Ruth rode with the Ludlows at Myron's funeral.

Since most of the foregoing is from the testimony of Ruth it would take strong evidence indeed to overcome it and we find none, strong or weak.

The question naturally arises, Why this verdict? We think it reasonably explained by peculiarities in the presentation of the cause, the admission of prejudicial testimony which was immaterial and much of which it was difficult to keep out, the youth of Ruth, and the tragic death of her husband. It was admitted that the Ludlows had opposed the marriage. This they had a perfect right to do. On that ground Ruth might with almost equal propriety have joined her own parents. It was admitted that the Ludlows had given their son some slight assistance in defending the separate maintenance case, but since that case and this in their facts were so inextricably interwoven it could not well have been otherwise. Besides, in certain cases such parental conduct may be perfectly proper and legal and it does not appear that this was not such a case. It does appear that the Ludlows did not take the position usual in such cases of making Ruth a member of their family. No such legal duty rested upon them. She testified that the engagement was broken because of the opposition of the Ludlows; that

Mrs. Ludlow was bitter because of the secret marriage; that Myron's grandmother said certain things; that at the time of the marriage Myron had an insurance policy payable to his mother in which he did not change the beneficiary; that Mrs. Ludlow said ''When Myron is tired of Ruth he has got a home to come to.'' Another witness testified that it was common rumor that the Ludlows refused to permit Ruth to view her husband's remains at the undertakers; that prior to the marriage Mrs. Ludlow endeavored to get her son to come back home and told him, ''The whole town was talking about him leaving home'' and that she said, ''I will never consent to you going out to see Ruth.'' There is much more of the same character all more or less prejudicial, and all immaterial. Much hearsay evidence was admitted concerning declarations of Myron. This on the ground that it was proper to show the state of mind of the alienated spouse. The court correctly ruled in the beginning that this could only follow direct and substantial evidence of defendants' malicious misconduct. Considerable of it, however, preceded anything that could possibly be considered such direct and substantial evidence, and other portions of it could have no possible bearing on Myron's state of mind. Of the latter class is Ruth's testimony that Myron gave parental opposition as an excuse for not having changed the insurance policy and the testimony of another witness that he said his folks would not pay it and he couldn't.

Further examples seem unnecessary. Enough has been given to clearly disclose how this verdict came to be returned and why it cannot be upheld. No more disagreeable duty devolves upon an appellate court than to set aside a verdict because unsupported, but no more imperative duty is imposed when demanded by the record. Such seems to us the situation with which we are now confronted. To sustain this judgment requires that we warn parents to oppose in good faith the marriage of their children, to advise with them in good faith about their marital difficulties after the relationship has been estab-

lished, to offer them refuge when the home has been broken up, and to support them in the maintenance of their legal rights under such unfortunate circumstances, only at the peril of being mulcted in heavy damages for their loyalty to their offspring. Any such conclusion is contrary to the well established law of all jurisdictions freely admitted by counsel for both parties herein.

The judgment is reversed with directions to enter judgment for plaintiffs herein.

MR. JUSTICE HILLIARD, MR. JUSTICE BOUCK and MR. JUSTICE YOUNG dissent.

MR. JUSTICE BOUCK, dissenting.

I cannot approve the judgment of reversal or the opinion of the court herein.

That portion of the bill of exceptions which contains the evidence received in the district court amounts to 761 folios. The majority opinion employs less than ten folios in what at first glance appears to be an attempt to epitomize that voluminous evidence. It is obviously not an epitome, however, but a catalogue of detached bits of testimony, each one lifted out of its proper context, and necessarily omits many other parts of the testimony. My study of the entire evidence has brought the conviction that the omitted matters fairly supply a sufficient and substantial basis for the resulting jury verdict awarding $4,400 damages to the plaintiff, now defendant in error. This court has—unwarrantably, I think—permitted itself to supersede the jury as the fact-finding body herein.

Among the Colorado cases that may be perused with profit, particularly on the question of malice in actions for alienation of affections, are: *Bradbury v. Brooks,* 82 Colo. 133, 257 Pac. 359; *McAllister v. McAllister,* 72 Colo. 28, 209 Pac. 788; *Williams v. Williams,* 20 Colo. 51, 37 Pac. 614.

The psychological analysis offered by the opinion to explain the verdict of the jury is hardly called for. In dealing with a jury verdict, the reviewing court is not

required to conjecture the mental processes of the jurors. Certain it is that, not having seen or heard the living witnesses, we are not in so good a position as the jurors, who did see and hear them, to judge of the weight and sufficiency of the witnesses' testimony. Under sound fundamental principles of our American jurisprudence, this court is bound by the jury's fact findings. I fear that the rejection of these findings, by reversal of the judgment with directions to dismiss the case, works an irretrievable miscarriage of justice. At the very least, this court should have granted the right of a new trial.

For the reasons indicated, I respectfully dissent.