**Dorothy Vallone, Plaintiff in Error, v. Salvatore Vallone and Josephine Vallone, Defendants in Error.**

### Gen. No. 27,550.

1. HUSBAND AND WIFE—*alienation of husband's affections by his parents as jury question.* It is error to direct a verdict for defendants, in a wife's action against her husband's parents for damages for alienating his affections, where the evidence shows that plaintiff and her husband lived happily together for about two months after their marriage and that his parents then prevailed upon the husband to move into a flat in the building where they lived and thereafter demanded all his time and money against the wishes of both plaintiff and her husband, that defendants caused him to neglect plaintiff and leave her without means of support or clothing for her expected child, that plaintiff was compelled to seek separate maintenance after the husband had locked her out of the family home, that defendants controlled and preserved the husband's affections and prevented him from returning to plaintiff after the separation, and tends to show that defendants were the cause of the husband's change of affections.

2. HUSBAND AND WIFE—*admissibility in wife's action for alienation of defendants' statements to the husband.* In an action by the wife against her husband's parents for damages for alienation of his affections, evidence of statements by the husband to plaintiff

in relation to his parents in regard to his domestic life are admissible to show his attitude towards plaintiff and as to the state of his affections even though they are hearsay and inadmissible to bind defendants on the issue that they were the cause of the alienation.

3. HUSBAND AND WIFE—*evidence in wife's action for alienation.* In an action by the wife against her husband's parents for damages for alienating his affections, the wife should be permitted to testify as to her husband's attitude towards her prior to the first overt act charged against defendants and as to what subsequently happened in relation to her living and support.

4. HUSBAND AND WIFE—*admissibility of statements of defendants to third persons in action for alienation.* In an action by the wife for alienation of her husband's affections by his parents, evidence that the mother-in-law told her son in the presence of plaintiff and others in court at the time of a separate maintenance proceeding by the wife resulting from her husband locking her out of the family house, "not to go back" to plaintiff and otherwise dissuading him from returning to plaintiff, is admissible.

5. HUSBAND AND WIFE—*admissibility of statements to third person in wife's action for alienation.* In a wife's action for alienation against her husband's parents, evidence that defendants told their son not to return to plaintiff and that the son stated to a third person that he wanted to live with plaintiff but that defendants would not let him and would kill him if they knew he visited such person to arrange to return to plaintiff, is admissible to show his state of affections and mental condition.

Error by plaintiff to the Circuit Court of Cook county; the Hon. PHILIP L. SULLIVAN, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1922. Reversed and remanded. Opinion filed April 11, 1923.

HOOVER & CODY, for plaintiff in error.

No appearance for defendants in error.

MR. JUSTICE TAYLOR delivered the opinion of the court.

On September 15, 1919, the plaintiff, Dorothy Vallone, brought suit against the defendants, Salvatore Vallone and Josephine Vallone, for damages for the alienation of the affections of her husband, who was the son of the defendants.

The declaration alleges, among other things, that

the defendants, contriving to injure the plaintiff and to deprive her of the society, friendship and assistance of her husband, on February 14, 1916, and on other days before and after that date, did knowingly, wilfully, wickedly and maliciously destroy and alienate from her, the plaintiff, the affections of Thomas Vallone, her husband, by means whereof she, the plaintiff, has wholly lost and been deprived of the society, affections, friendship, association, comfort and support of her husband in her domestic affairs in life during the time she ought to have had them, to the damage to her in the sum of $5,000; that she was duly married to Thomas Vallone on May 6, 1915, and lived together with her husband happily as his wife until the defendants undertook to, and did, wilfully and maliciously destroy and alienate from her the affections of her husband.

On October 23, 1919, the defendants filed a plea of the general issue. There was a trial by jury and at the close of the plaintiff's evidence, upon a motion of counsel for the defendants, the trial judge instructed the jury to find the defendants not guilty. The jury accordingly brought in a verdict to that effect. Motions were then made by counsel for the plaintiff for a new trial and in arrest of judgment, both of which were overruled. The judgment was then entered for the defendants and against the plaintiff for costs. It is now before us on a writ of error. No brief has been filed on behalf of the defendants in error.

The plaintiff, when a few months less than sixteen years of age, was, on October 3, 1915, married to the defendant, Thomas Vallone. They began housekeeping as soon as they were married in a cottage at 4837 Federal street, Chicago. At that time, Salvatore and Josephine Vallone, the parents of the plaintiff's husband, Thomas Vallone, were living on the second floor of 4727 Federal street. It is the testimony of the plaintiff that her husband was very good to her while

they lived in the cottage; that he was at home with her every evening and gave her all his money; that they lived there for two months. She says that several months after the marriage her mother-in-law, Josephine Vallone, came to the cottage of the plaintiff and her husband and said to the plaintiff's husband, "We want you to move in our flat"; that he then said, "I don't want to move. We are getting along fine here"; that the mother-in-law then said, "You have to move to our place, you are ours, you know"; that her husband then said to her, "Do you want to go?" and she, the plaintiff answered, "No, I don't want to go;" that the mother-in-law then said, "Well, you have to go with us." The plaintiff and her husband then, accordingly, moved to 4727 Federal street and lived on the first floor of that building. The mother-in-law and father-in-law lived on the second floor.

The plaintiff further testified that for a short time her husband was good to her but that the defendants had him upstairs most of the time and that he gave his money to them; that they called him upstairs but never invited her to go up; that on one occasion in February, 1916, she had a conversation with her mother-in-law in regard to her, the plaintiff's relations with her husband, and that she asked her mother-in-law for money and her mother-in-law said, "What do you want it for?" and that as she was to become a mother she said, "I want to get clothes for the baby"; that her mother-in-law then said, "You can't have it. Tom belongs to us. He has to bring the money to us. If you want anything to eat, come upstairs"; that she, the plaintiff, answered, "No, I am married to Tom, not to you"; that her mother-in-law insisted, "He belongs to us, he has to bring us money." She further testified that her mother-in-law told her that the plaintiff's husband had given her the money and that when she, the plaintiff, said to her mother-in-law, "I think you ought to give me some

money; I cannot live like this,'' her mother-in-law said, ''If you don't like it, you don't have to stay''; that when she told her mother-in-law she was about to become a mother and wanted to buy baby clothes and asked her for money, her mother-in-law said she didn't care what it was wanted for.

On May 15, 1916, the plaintiff gave birth to a child which, twenty-two days afterwards, died. Neither of the defendants nor the husband of the plaintiff attended the funeral.

There is some evidence in the record that in June, 1917, the plaintiff and her husband were before Judge Foell on a bill for separate maintenance and that on that occasion when Judge Foell said, you must not live with his parents, that they should go and look for a flat the next afternoon, and said to her husband, you are willing to go back to your wife, her mother-in-law, the defendant, said, ''Don't go back to her.''

It is further shown that on June 21, 1919, and some other occasions, her husband went to see her, and the record shows that when counsel for the plaintiff desired to put in evidence what was said by her husband to her in relation to his father and mother bearing upon their domestic life, the trial judge ruled it out. The court allowed her, however, to state that she never refused to live with her husband.

On cross-examination the plaintiff testified that on February 14, 1916, she asked her husband for some money and he went upstairs to tell his mother about it; that afterwards he came down and told her to go up and tell his mother about it because they were very cross with him; that he then took the keys away from her and put her out of the house; that when she left she just wandered about alone; that in the evening she was tired out, had no money, and so, pawned her engagement ring and got $10 for it; that she walked to 63rd street, saw a hotel sign, which was the Englewood Hotel, and went in and registered under the

name of Pearl Rogers; that she then undertook to look for a job; that she got a job of housework and taking care of a baby and was there about a week when one evening two detectives came and took her to the police station; that in the early part of March, 1916, a little over a week after she left home, she got another job through an advertisement in the paper; that she did not remember the name of the man who hired her.

The plaintiff offered to prove by one Thomas Alvano, her brother, that he knew the plaintiff's mother-in-law and that in June, 1917, in Judge Foell's court room, he heard the mother-in-law of the plaintiff tell her son not to go back to his wife. Further, that he heard the husband of the plaintiff say that he wanted to live with his wife but that his parents would not let him; that the plaintiff's husband said, further, if they, referring to his parents, "knew he came over there to arrange to live with her they would kill him"; that evidence the trial judge refused to admit. A similar proffer was made of evidence by a witness, Conney Alvano, and a similar ruling was made by the court.

The father of the plaintiff testified that he visited his daughter and her husband in their cottage, where they moved immediately after their marriage, and that they were doing well during the time they lived there; that the plaintiff's husband earned from $2 or $3 to $15 a day; that he had an ice business of his own and owned an ice wagon. Counsel for the plaintiff offered, further, to prove by that witness that he heard the mother-in-law of the plaintiff say to her son that he should not live with his wife but the trial judge ruled that it was inadmissible. Further, one Gimmini, testified that he had a talk with the mother-in-law of the plaintiff at her home in June, 1919, and asked her if her son would take the plaintiff, his wife, back, whereupon the plaintiff's mother-in-law, Jo-

sephine Vallone, said, "No, I don't like Tom to go back" and that on the same occasion Salvatore Vallone said, "No, I don't want Tommy to go back. Tommy belongs to us, not to her. Tommy has not to go back, and let me keep his pay." Further, that Josephine Vallone said, "She can look for another man, Tommy is going to live with me."

There was offered in evidence a decree for separate maintenance in favor of the plaintiff and against Thomas Vallone, her husband, which was entered in the circuit court of Cook county, Illinois, on April 3, 1920. In that decree it is recited that they had been living apart since February 14, 1916, and without the fault of the plaintiff and wholly because of the fault of the defendant; that decree ordered the payment by the husband of the plaintiff to her of $7 a week for 65 weeks and $6 a week thereafter until further order of the court. The plaintiff testified that she had not received the payments for her separate support provided for in that decree; that her husband was put in jail two or three times and was willing to pay after he was in jail but they would not let him.

At the close of the plaintiff's evidence upon motion by counsel for the defendants the trial judge instructed the jury to find the defendants not guilty. Accordingly, a verdict in favor of the defendants was found and motions for a new trial and in arrest of judgment were duly made on behalf of the plaintiff and overruled by the court. Judgment was entered for the defendants, and is now before us upon a writ of error.

Since the decision of *Betser v. Betser*, 186 Ill. 537, it has been the law in this State that a wife has a right of action against a third party for alienating the affections of her husband. In that case the court said:

"The authorities uniformly hold that a husband has a right of action at common law for alienating

the affections of his wife or enticing her away from him; but the weight of authority, at least in a number of cases decided, holds that the wife cannot maintain a similar action for the loss of the affections or society of her husband. This discrimination against the wife has its origin in the ancient common-law doctrine that the husband and wife are one, that one being the hus-band and the wife's rights merged in him. That idea has, however, been exploded by the enlightenment of the present age and by legislation.''

And in that case the court further said: ''We entertain no doubt that by the clear weight of both reason and authority a wife has, under our statutes, precisely the same right of recovery for such a loss as the husband.'' *Smith v. Gillapp,* 123 Ill. App. 121; *Bennett v. Bennett,* 116 N. Y. 584.

The evidence shows that the plaintiff and her husband began housekeeping on October 3, 1915, the day they were married, in a cottage at 4837 Federal street, and that at that time the parents of her husband were living on the second floor of 4727 Federal street; that for about two months after the marriage they lived together happily, the husband being home every evening and giving the plaintiff his earnings. Subsequently, however, it is shown the mother of the plaintiff's husband persuaded and prevailed upon the husband of the plaintiff to move to 4727 Federal street, and that at that time the husband of the plaintiff told his mother that he did not want to move; that they were getting along well where they were, but that his mother insisted and said, ''You have to move to our place, you are ours, you know.'' The plaintiff when asked about moving said that she did not want to go, but the defendants insisted that they would have to go. Accordingly the plaintiff and her husband moved into the first floor of the building on the second floor of which her husband's parents lived, and from that time on the husband of the plaintiff began to neglect her, spending the time upstairs with his par-

ents and giving his money to them whereas formerly he had given it to his wife. That went on to such an extent that it became necessary for the plaintiff to ask the mother of her husband for money in order that she might prepare clothes for the child which she expected to give birth to. The statements of the plaintiff's mother-in-law and father-in-law are very strongly to the effect that they were making an effort to control him and preserve his affections for his parents to the detriment of his affection for his wife. On one occasion the mother-in-law said, when the plaintiff asked for some money, "You can't have it, Tom belongs to us. He has to bring the money to us. If you want anything to eat, come upstairs." And, further, "He belongs to us, he has to bring us the money." On another occasion the plaintiff's mother-in-law said, "If you don't like it, you don't have to stay." And, subsequently, when the matter of separate maintenance was before Judge Foell, the evidence shows that the plaintiff's mother-in-law said to the plaintiff's husband, "Don't go back to her." Showing the change that occurred in his affections, the evidence shows that on February 14, 1916, he took the house keys from her and put her out of the house. There appears to be ample evidence that both the defendants did assist in bringing about an alienation of the husband's affections.

It would seem from the evidence that the father and mother of the plaintiff's husband, beginning a short time after the plaintiff was married, undertook to bring him back to their family, being their son, in order that he might live with them perhaps as before and give them his earnings, all of which tended to the inevitable neglect of his wife and, quite obviously, to the alienation of his affection for her. She was, at the time of her marriage, not much more than a child, being between fifteen and sixteen years of age and obviously, from the evidence, his parents determined

to prevent her and her husband from continuing to live as they had begun, immediately after the marriage, by themselves, as a separate family. No matter how the evidence is viewed, it seems quite obvious that it was sufficient to justify its submission to the jury. As the present judgment will have to be reversed, and there may be a new trial, it seems proper to make some suggestions as to the evidence that is admissible in such cases, and to pass upon certain rulings of the trial judge that were objected to in the course of the trial that actually took place.

It must be borne in mind that a cause of action for alienation of affections involves two elements, first, the alienation of the affections, and second, the cause. Evidence of the first is all that which tends reasonably to show the change which has taken place in the affections of the third person or spouse; and of the second, all of which tends to prove such overt acts on the part of the defendants as may have brought about the alienation. There are, therefore, two areas of facts concerning which evidence may be offered. When, in the instant case, the plaintiff was asked to state what her husband had said to her in relation to his parents or either of them in regard to his domestic life, the question must be considered as apt, as an effort to elicit facts tending to show his own thinking, and directly bearing upon the state of his affections. As to the state of his affections, it is direct evidence. It is true, that, if considered merely as evidence against the defendants, it is hearsay. It will be seen, therefore, that as to one area of facts it is competent as direct evidence, and as to another it is incompetent, because it is hearsay evidence. Under such circumstances it should be admitted but the trial judge should bear in mind, and so admonish the jury, that it is admitted only and solely as proof of the state of the affections of the plaintiff's spouse, and that it is not

to be considered at all as evidence of conduct upon the part of those being sued.

The matter in general has been discussed in a number of decided cases. In *Huling v. Huling*, 32 Ill. App. 519, where the trial court had permitted the plaintiff to state a conversation she had with her husband as to their living together and as to the objection of his parents to the marriage, this court held that such evidence was merely hearsay and, therefore, incompetent. In some cases such as *Baker v. Baker*, 16 Abb. N. C. (N. Y.) 293; *Miller v. Miller*, 154 Iowa 344; *Hardwick v. Hardwick*, 130 Iowa 230; *Williams v. Williams*, 20 Colo. 51; and *White v. White*, 140 Wis. 538, it has been held that—in proof of the act of the plaintiff's spouse in separating from the plaintiff—such statements as may have been made by the plaintiff's spouse in explanation of, or as a reason for, his or her conduct are admissible. On the other hand, in such cases as the following: *Cochran v. Cochran*, 196 N. Y. 86; *Westlake v. Westlake*, 34 Ohio St. 621; *Magers v. Magers*, 143 Iowa 750; and *Schneider v. Tapfer*, 92 Ore. 520, 180 Pac. 107, it was held that the testimony of the plaintiff or others, as to statements made by the plaintiff's spouse, which were not made at the time of the separation of husband and wife, as to the conduct of the defendants, as evidenced by statements made by them, was not admissible. An examination of those cases suggests, however, that the evidence offered was considered inadmissible because it was offered not only as evidence of the state of affections of the plaintiff's spouse, but as evidence tending to prove that the defendants were the cause of the alienation of his affections.

In the *White* case, *supra*, where the trial court had allowed the plaintiff to testify to declarations made by her husband to her and others, which declarations purported to relate the offers and inducements held out to him by his parents to induce him to separate from

and abandon the plaintiff, the court said: "This class of evidence has been held proper and competent as showing the influence producing the alienation and the loss of affection complained of and the cause of separation and the destruction of the marital relation." Citing *Hardwick v. Hardwick,* 130 Iowa 230; *Williams v. Williams,* 20 Colo. 51; *Nevins v. Nevins,* 68 Kan. 410. These cases all support the doctrine that such evidence is admissible as direct evidence of the state of the affections of the plaintiff's spouse, and as bearing upon his reasons for the separation. Further, they all support the rule that such evidence is not admissible to show or prove in any way the conduct of the defendants.

In the *White* case, *supra,* the court used the following language:

"The court permitted plaintiff to testify to declarations made by her husband to her and others, which purport to give the offers and inducements held out to him by his parents to induce him to separate from and abandon the plaintiff. It is claimed that this was prejudicial error. This class of evidence has been held proper and competent as showing the influences producing the alienation and the loss of affection complained of and the cause of separation and the destruction of the marital relation. *Hardwick v. Hardwick,* 130 Iowa 230, 106 N. W. 639; *Williams v. Williams,* 20 Colo. 51, 37 Pac. 614; *Nevins v. Nevins,* 68 Kan. 410, 75 Pac. 492. To the same effect is the case of *Horner v. Yance,* 93 Wis. 352, 67 N. W. 720."

In the *Hardwick* case, *supra,* the court held that statements of the husband that he loved his wife, which were made to her at the time he told her his father desired to separate them, were admissible, but should be limited to the determination of the state of their affection for each other and to "the effect of defendant's influence, if any, exerted on the son." That case followed *Sexton v. Sexton,* 129 Iowa 487. In the *Hardwick* case the court said:

"The precise issue is whether the defendant has wrongfully and maliciously induced his son to separate himself and abandon plaintiff, as his wife, thus depriving her of the comfort, society and support of her husband. The nature of this issue is such that it was not only proper to show the declarations and act of defendant in respect to his son's marriage relation, but also to show the effect of these upon the son; that is, the state of the husband's mind toward his wife in consequence of defendant's conduct, and the way in which such conduct caused him to treat his wife. When the doing of an act by a person may be proven, the declarations of such person accompanying the act and having reference thereto are admissible in evidence as explanatory thereof."

In the *Williams* case, *supra,* the court said:

"Under the issue to be determined, and in connection with the testimony introduced, it was, in our opinion, proper to admit in evidence the declarations of Edward, for the purpose of showing what influenced his conduct in separating from his wife. It is true his mere declarations were not admissible to show what his mother's conduct was, nor was it, of itself alone, material how bad his mother's conduct was towards plaintiff; for, no matter how bad her conduct was, she could not properly be held liable in this action unless the effect of her conduct was such as to cause Edward to become estranged from and desert his wife. From the record it clearly appears that the trial court was careful to place the declarations of the husband upon this ground. Thus limited, it was not error to admit proof of his declarations."

On the other hand, in *Cochran v. Cochran, supra,* the court definitely held (Bartlett J., dissenting) that certain statements of the husband testified to by the wife, who was the plaintiff, concerning the attitude of his father and mother, the defendants, were improperly admitted. The court said: "While, of course, plaintiff was required to prove the unlawful conduct of defendants, and while such unlawful conduct might be evidenced by such acts as were outlined in the evi-

dence referred to, it was incumbent upon her to prove the same by competent testimony, and it was not proper to give evidence of her husband's declarations on the subject. Such evidence offended against the general rules of evidence and has been specifically condemned in actions similar to this one." Citing *Huling v. Huling,* 32 Ill. App. 519; *White v. Ross,* 47 Mich. 172; *Preston v. Bowers,* 13 Ohio St. 1; and *Manwarren v. Mason,* 79 Hun (N. Y.) 592.

In the *White* case, *supra,* the court held that where a husband sued his wife's father and mother, if there was evidence of misconduct on their part, the letters of his wife showing affection for him were inadmissible. In the *Preston* case, *supra,* which was an action by the husband to recover damages for enticing his wife to leave his bed and board, it was held that the husband might put in evidence the declarations of the wife made shortly prior to the alleged seduction in order to show the state of her affections towards him up to the time of the injuries complained of, but that statements of the wife as to the conduct of the defendant tending to prove the allegations against the defendant were merely hearsay and inadmissible. It will be seen that the *Cochran* case, *supra,* is based, primarily, on the *Huling* case, which was decided by this court. We are of the opinion, however, after examination of many cases and considering the necessity of proof of the state of the affections of the plaintiff's spouse, that evidence of statements on that subject made by him are competent, but if they in any way reflect upon the defendants as being the cause of the alienation of the affections, those statements should be considered only as proof of the alienation and not in any way as proof that the defendants were the cause. The subject is discussed in Wigmore on Evidence, vol. 1, sec. 1730, and vol. 5, sec. 1730, and in an elaborate note in 4 A. L. R. 497.

The record shows that when the plaintiff was asked

what her husband's attitude was when they first moved in to the premises known as 4727 Federal street, it was answered and then objected to by counsel for the defendants, and the objection sustained. The question was proper and should have been allowed to be answered.

The record shows that the question was asked of the plaintiff, ''What subsequently happened in relation to your living there, so far as money was concerned, the question of money?'' that an objection was made and sustained thereto. The question was not in proper form, but the subject of it was a proper matter for examination.

The record shows that a conversation took place in court in connection with a separate maintenance proceeding which the plaintiff had pending against her husband and that there were present herself, her husband and her mother-in-law. That conversation was competent. The record shows that the plaintiff was asked to relate a conversation that occurred on the evening of June 21, 1919, between her husband and herself in relation to the defendants and which pertained to the domestic life of the plaintiff and her husband. The trial judge held that that was incompetent. Evidence of that conversation should have been admitted in so far as it pertained to the state of the affections of her husband and the influences, as far as he was concerned, which had affected him.

The record shows that the plaintiff was asked to relate a conversation which took place on the evening of June 21, 1919, between her and her husband ''in relation to his father and mother or either of them'' bearing upon the domestic life of the plaintiff with her husband, and that the trial judge ruled that the conversation was inadmissible. The evidence should have been admitted.

The record shows that the plaintiff was asked what, if anything, her ''husband said in relation to his fa-

ther and mother, or either of them, bearing upon'' their domestic life, meaning that of the plaintiff and her husband, and that the trial judge ruled it was inadmissible. That should have been admitted with the admonition and qualification referred to above in the discussion of the law in such a case.

The record shows that one Thomas Albano, brother of the plaintiff, testified that he heard the defendant, Josephine Vallone, tell the husband of the plaintiff not to go back to his wife. Upon being objected to by counsel for the defendants, the court struck it out. That was error. So, likewise, was the ruling of the trial judge in excluding the testimony of the same witness concerning a conversation in which the husband of the plaintiff spoke of the attitude of his parents towards him, meaning the husband of the plaintiff, and the plaintiff.

The record shows that it was stipulated by counsel that if Thomas Albano were allowed to testify he would state that the husband of the plaintiff said he wanted to live with his wife but that his parents would not let him; that if they knew he came over there to arrange to live with her they would kill him. That should have been admitted as bearing upon the mental condition and the state of affections of the plaintiff's husband, but should not be considered as in any way evidence of conduct on the part of either of the defendants.

Owing to the errors referred to, the judgment will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*

THOMSON, P. J., and O'CONNOR, J., concur.