**JACKSON et ux. v. JACKSON.**

No. 2475.

Court of Civil Appeals of Texas. El Paso.
Jan. 29, 1931.

Rehearing Denied Feb. 19, 1931.

Scarborough, Ely & King, of Abilene, for appellants.

Kirby, King & Overshiner, of Abilene, for appellee.

WALTHALL, J.

Mrs. Newton Jackson brought this suit against I. N. Jackson and wife, Mrs. Elma Jackson, to recover damages, actual and exemplary, alleging that by wrongful acts, and actuated by malice, they (defendants) induced her husband, Newton Jackson, to abandon her as his wife. Briefly stated, plaintiff alleged that she was married to Newton Jackson; that Newton Jackson was the son of the defendants, I. N. Jackson and wife, Elma Jackson, and that by reason of the facts alleged, instigated by malice, defendants alienated the affections of their son from her, and caused him to abandon her as his wife.

Defendants answered by general demurrer, general denial, and special denial of each and every allegation of plaintiff's petition.

By trial amendment defendants pleaded that, should it be found that Newton Jackson left plaintiff on the advice of defendants, same was not willful, but was done in good faith for what was considered best for the welfare of their son, Newton Jackson.

The case was tried to a jury and submitted upon special issues.

Upon the special issues submitted the jury found: That I. N. Jackson and wife, Mrs. Elma Jackson, by wrongful acts, induced Newton Jackson to abandon his wife, and that, in inducing Newton Jackson to abandon his wife, I. N. Jackson and Mrs. Elma Jackson were actuated by malice. The jury found and stated the sum of money which, if paid now, would compensate plaintiff for the damages sustained by her on account of the loss of affections, love, and companionship of her husband. The jury also found and assessed against defendants, jointly, a sum of money as exemplary damages. The jury found that in inducing Newton Jackson to abandon his wife such action on their part was not done in good faith and for the best welfare of their son.

The court entered judgment in conformance with the verdict.

The court overruled defendants' motion for a new trial, to which defendants excepted, gave notice of record, and perfected this appeal. Defendants also filed assignments of error.

Opinion.

Appellants present forty-two propositions. We think we may group them in what we may say.

Appellee had testified that when her husband left her in California he left her without funds or friends; that she was about to become a mother. She was then permitted to testify, over objection, that she called upon appellants to assist her financially and that they refused to do so. Again, appellee was asked: "Did you ask Mrs. Jackson for financial support on account of the fact that you were to become a mother?" In answer appellee was permitted to testify, over objection, "she (referring to Mrs. Jackson) said she would help. She said she would pay my doctor's bill and buy me a little clothes for my baby. So they wrote to Dr. Pickard telling him that they would be responsible for the doctor's bill." Again, appellant, I. N. Jackson, was asked: "Did you not tell the plaintiff that you would pay for the clothes for her and her baby?" Witness was permitted to answer, over objection: He "would not turn any body loose to charge things to him." To which counsel for appellee said: "Then you visited your displeasure upon the child of your own blood?" Again, appellant was asked by counsel for appellee: "Have you contributed anything to the support and maintenance of your grandson, the plaintiff's child?" Witness was permitted to say, over objection, he "had not contributed anything to the support of plaintiff or her child."

Appellant, Mrs. I. N. Jackson, was asked the same question last above stated, and, over objection, she made a similar answer. The objection to each of the above questions and answers was that appellants were under no obligation to support appellee or her child, and that the questions and answers, and the conduct of appellee's counsel were prejudicial and inflammatory.

Appellants submit that they were under no obligation to support appellee or her child, and that the cases and authorities referred to sustain their position.

In her counter proposition appellee submits that the evidence was admissible as tending to show malice, on the issue of exemplary damages, and as showing appellants' unkind and hostile attitude toward appellee, a circumstance which might be taken with other circumstances tending to show that appellants brought about the separation.

This is not a case where appellee is suing appellants for support of herself and child. The issues presented by appellee, and submitted, are that appellants wrongfully induced her husband to abandon her as his wife, and

that in doing so they were actuated by malice, and asked for actual and exemplary damages.

In addition to the general denial, the only special issue, tendered and submitted by appellants, was that, if they did induce their son to abandon appellee as his wife, in doing so they acted in good faith and for the best welfare of their son.

Appellants' son, Newton Jackson, was of age when he married appellee, and when appellee requested and appellants refused financial assistance to appellee. For the purpose of the proposition that appellants were under no legal obligation to send money to appellee, or to render her or her child any financial assistance whatever, under any of the circumstances under which financial assistance was requested of them by appellee, it might be conceded that appellants were under no legal obligation to render appellee or her child financial or other assistance. The question still remains, Was the evidence admissible as tending to prove or disprove any issue in the case?

Without quoting from the evidence we think it unquestionably shows that appellants' son took appellee in his automobile from her home in Abilene with the intention, and in fact did take her to California, and while on the way married her. Appellants introduced in evidence the following telegrams, omitting formal parts:

"Apr. 12—29.

"I. N. Jackson,

"Dear Mama Papa I married Irene Wininger November fourth please forgive love from us

"[Signed] Newton Jackson 7:30 A. M."

"April 13, 1929.

"I. N. Jackson Mrs. Jackson Newton left me today account letter enclosed in Clara Letter without funds and to become a mother please wire some money to help needed badly Answer quick.

"[Signed] Irene Jackson."

The following unsigned letter was introduced in evidence. Appellant, Mrs. Jackson, admitted having written it.

"Apr. 17.

"Irene:

"We have just received your letter. We are certainly sorry all this has happened. You got yourself into this now you will have to get out the best you can. You know we were opposed to Newton having anything to do with you. You have caused us a great deal of trouble, and caused him to be away from home right now. If we had have known anything about all this we would have stopped it and saved a lot of trouble. Now you need not expect anything from us, now or hereafter."

At the time the above letter was written Newton had arrived at home (Abilene).

A portion of the following letter was introduced by appellee, and the rest by appellants,

so we copy the whole of it. In the meantime appellee had returned to Abilene.

"Abilene, Texas. May 6,

"Dear Newton:

"We have just received your letter. That girl came right over here. Now we don't want you to be like Leland. If you love that girl, now is the time to say so. I told her I would write you and show her the letter so you can write us one and write what you want her to know. I believe if you write us and say you are through forever with her, and expect to get a divorce, she will let up. She says she is from Mo. We are considering taking her to a Dr. at Sweetwater to see if it is true, if it is, we will buy her a ticket to St. Louis, where she says her sister is going. You see if we don't know her condition, she might try to show a child of her sister or someone else as that one and cause us a lot of trouble. We have certainly had a lot of trouble." (The rest of the letter, except in the close, refers to matters wholly foreign to any issues here.) The letter closes as follows:

"Papa will send the money. Write soon.
"Love, Mama."

The letter does not give Newton's address, but the evidence shows that he was in Fort Worth. Appellants introduced in evidence a letter from Newton to his mother. It is without date and does not give his address. It is lengthy, and we state only some of its contents. It acknowledges receipt of a letter from his mother the day he wrote, and with reference to "the girl I married, asking me whether or not I loved her." The letter states he does not love her, but hates her, and would never as long as he lived consider living with her, and planned to quit her weeks before he did; states he loaths and despises her, and prays that he "may never see her again in this life or in the hereafter"; advises against giving her money, consideration, or sympathy; did not know her condition and did not care, and all that he could "wish for her in this life is eternal trouble," and saying: "I would not take her back nor help her even if you asked me to, nor do I have any sympathy for her. I must close hoping that I have expressed myself clearly."

The above letter was read to appellee before appellee went to Fort Worth.

We state some uncontroverted facts from the record. When appellee returned from California she went to see the appellants at their home in Abilene. That was about three weeks after Newton had returned. Appellee asked appellants to tell her where Newton was, and they refused to do so.

The evidence covers some two hundred pages of the record, and we can state briefly only a few facts testified to by the witnesses, with some brief quotations, in order to determine the relevancy of some of the evi-

dence referred to in the propositions, and other matters raised in the briefs.

Appellee testified that she went to appellants' home and had conversations with them both before and after she learned of the whereabouts of her husband. She said: They said they had heard from Newton but would not tell her where he was but told why. She (Mrs. Jackson) said: "They were absolutely through. They would not let me live with him. I asked her why, and she said, if I was not like I was—that I was ignorant. Mrs. Jackson said I was not in his class. I was too low class. * * * She said they would not care for me living with him if it was not for that. Both Mr. and Mrs. Jackson were present. When they told me that I was not his social equal I don't know what I said. I just told them I thought I was. I told them I knew I didn't have everything he did, but if they would tell Newton to come back to me, why we would leave Abilene and stay away from her. She said it was disgracing her because we went off there and married. I told them if they would let him come back to me we would leave Abilene and not come back. To that proposition they told me that they would not let him come back at all. Said if he ever came back they would be through with him and that they were going to disinherit him. * * * I went back there the third time, and on that time she told me not to come back any more. It wouldn't do any good. She said, 'We are going to send him to Reno.' And Mr. Jackson said, 'Yes, yes, we are going to send him to Reno if you start anything.' They were going to send him to Reno to get a divorce from me. * * * I asked them where he (her husband) was but they would not tell me. I continued to try to find out where my husband was and I found out the next morning. I found out that he was staying at the Westbrook Hotel in Fort Worth. My mother and I then went to Fort Worth. We found Newton there. We went into the lobby of the Westbrook Hotel and were there when Newton came in. My mother was present. * * * When we met him he just says, 'Well, hello.' I told him I wanted to talk to him and he said 'All right.' So we went up to his room. We talked and he acted like he was glad to see me and everything. * * * After we talked a while he said he was intending to come and get me. * * * I detailed to Newton the interview I had with his mother and father, and he said he intended to come after me in another two weeks anyway. He intended to come by there. He had learned his lesson about leaving me, that's what he said. As to his attitude toward me after that conversation, we talked and he told mother that I could stay right there with him and that he would go register me in the hotel and we could get an apartment in a few days, that he had a job with the Hudson-Essex people. He

told mother that he would keep me there and he registered me in and mother went to another hotel where we were registered in and she stayed there. The next morning he went to work and the next morning mother came home. * * * We all talked and got it all straightened out. Newton said he wanted to take me back and everything. In that conversation while we were there in Fort Worth Newton made a statement to me as to his mother's and father's statement to him. He told me why he left me. He told me that the letter he got in San Bernardino was the cause, and he said his father and mother was the cause of his leaving me. He told me that was why he left me, because of his people, because of his mother and father. * * * He told me that he would never have left me but for what they wrote him. He told me that he left me because of what they had told him. * * * Because they disapproved of me. * * * He also said he didn't care, he couldn't live without me. He said, 'I don't care what they say, we will live together—we will live together regardless of what they say. I don't think I can make a living but I can try. I don't think they will help me any further. * * * After that I had been there four or five days and his mother and father showed up on the scene. Newton told me they were coming and we were checking out of the hotel. * * * I saw them walking in * * * the door. * * * Newton was paying the hotel manager and Newton told me to run and hide. Mr. and Mrs. Jackson were going up the elevator. When Newton came down he said, 'Come on honey and get our suitcases and put them in the car.' He said, 'See there, you almost got us caught.' He also said that he thought they saw me, and he said they told him to come back up there after a while. We were going to our apartment. We went there and as soon as we got there he said he would go back up there so they would not suspect anything. * * * We moved to our home and he left me there. * * * He talked pleasantly to me. He said, 'I have to go back where they are because they will wonder where I am.' * * * He just stayed about one hour and then he came back. When he came back he said his father saw me, * * * but did not tell his mother or something like that. He cried and he said he was afraid we were going to have some more trouble * * * with them. He said he was afraid that his people saw me and he was afraid they would make him leave me again."

Witness said Newton went back to work. She had no conversation with appellants at that time. After coming from work Newton went to where appellee was, then went to where appellants were, but did not offer to take appellee. He came back to appellee, and stayed with her that night. Appellants left Fort Worth after a stay of two days. About

two days later appellee and Newton went to Abilene. Appellee testified: "About coming home, he said his father was going to give him some money and that he was going to California and take me with him and we would not let them know we were going back together until we got out there. We came home and he took me to my home. * * * That was about ten o'clock at night. He told me to get my things together and he would be by for me about 5 o'clock in the morning. I got my things ready but at 5 o'clock he did not come 'for me. He never did come for me that night." She testified that she and her sister went to the Jackson home, and that she knocked on the front and back doors and that when they came to the door she asked them whether Newton was there; they said he was not; she told them that Newton was to come for her. They replied, "We gave him some money and sent him to Nevada to get a divorce. You need never expect to see him any more. They said they sent him away for good this time, and said I wouldn't ever find him any more." Witness testified that she had told them and had written them that she was in a family way. They said they "did not think it was Newton's," and continued to say things like that. They wanted her to go to Sweetwater to be examined and when she consented they said they had changed their mind. Said they did not want any one in Abilene to know that she and Newton were married. Her baby was born on the 13th of November. From the time Newton was to take her to California and did not, she had not seen him and he had not lived with her. She had asked appellants where Newton was, asked if they wouldn't write him to send her some money, said they would not; Mrs. Jackson said she would pay the doctor's bill and buy a little clothes for the baby; later asked her why she wouldn't pay the doctor's bill. Said she did not say she would, and Mr. Jackson said, "My wife did not tell you any such thing;" "she said I was not telling the truth."

There is much evidence similar to the above, both from appellee and her mother. Appellee's mother testified that appellee in her presence asked appellant I. N. Jackson whether he had heard from her husband. He said: "No, no, no, I don't know. I don't know where he is at. We just sent him off to get a divorce, me and mama. * * * Don't know where he is. Just gave him money and sent him off. You need not think you will ever see him any more. * * *" As to why he sent him off said, "My daughter was poor and she was not welcome in society. * * * You cannot have him; no, no. We sent him off to get a divorce. * * * That was after Newton had gone away the last time."

The evidence shows that appellee was about fourteen years old when she first commenced going with Newton, and was in her 17th year when she was married to him on November 24, 1928; he was about 26 years old.

In justice to appellants we will say that they admit having a number of conversations with appellee, but deny much of what appellee testified to; deny that they told appellee that they objected to her living with Newton as his wife because she was ignorant, or poor, or because she had no social position or prestige in Abilene, nor because Newton was educated and had financial backing; deny that they told her they had sent him away to get a divorce, or that they had done so, or that they had advised him to get a divorce; testified they were willing for Newton to live with appellee, if he wanted to.

We think the evidence admissible on the issues submitted as showing the attitude of appellants toward appellee.

If appellee's testimony is to be credited, the jury could get the idea therefrom that appellants were acting together with appellee's husband in abandoning appellee under the most distressing circumstances, and in refusing to give her information as to his whereabouts. Especially would that seem to be true after their reunion at Fort Worth and their return to Abilene. According to appellee's testimony, and it seems to be borne out by the undisputed credible facts, that Newton, if left to himself, wanted to live with appellee as his wife, but was influenced to abandon her the second time.

In his evidence Newton did not explain why he had abandoned his wife after he had taken her back and lived with her at Fort Worth, had brought her to Abilene telling her to have everything ready early the following morning for their continued journey, and, after going to his parents' home, again left her without a word of explanation. Certainly nothing of a serious nature had intervened between their reunion at Fort Worth and his leaving her the second time at Abilene; if so, it is not made to appear in the record. No explanation is given as to the cause of Newton's leaving appellee at Abilene. According to the evidence of appellee, Newton had said to her that he intended to take her with him, regardless of what appellants said or did, and yet, when he reached his home where appellants then were, he left his wife without any explanation then or thereafter. That appellants advised or caused the separation could be established by circumstantial as well as by direct evidence.

■■■ Appellants assign as prejudicial, inflammatory, and unjustified, remarks of counsel both in the opening and closing arguments to the jury. The court instructed the jury to disregard the remarks made in the opening argument, and counsel withdrew a portion of the remarks made in the closing. Appellants

say the remarks were calculated to and did "extract from the jury an unrighteous verdict for this appellee." We need not quote the verbiage of the remarks. We cannot attribute the verdict in favor of appellee wholly to the remarks of counsel. Counsel was authorized to discuss the evidence as the evidence is disclosed by the record, and to state and discuss such facts as counsel in good faith draws from all the circumstances of the case. Crosby County Cattle Company v. Corn (Tex. Civ. App.) 25 S.W.(2d) 283, and cases there cited. It is not submitted that counsel went outside the record or discussed facts not within the proof. Some of the facts stated by counsel are unquestioned, and if the testimony of appellee in all she said is to be believed, and a reasonable deduction therefrom as to what the facts are, counsel could hardly go outside the record in discussing them. The fact that remarks of counsel are harsh would not authorize or justify a reversal of the case. The court may not restrict counsel in argument to any certain view of the facts, or the deductions to be drawn therefrom. If, as the record shows, appellants were well-to-do people, and if, as the record shows, their son Newton was to some extent dependent upon the financial support of his parents, and if, as the evidence shows, his parents threatened to withdraw their financial support, and to disinherit him if he continued to live with appellee, and had sent him away to secure a divorce from appellee, and that he had actually abandoned appellee and gone away for such purpose, because of such threat of appellants, and if, as she testified, appellants said to her she was not in his class intellectually, financially, or socially, and if, as appellee testified, Newton said to her that he left her because of his parents, because of what they had said to him, the argument of counsel would not be outside the evidence. If the argument of counsel is within the proof, appeals to sympathy are not ordinarily considered improper and furnish no ground of complaint. 38 Cyc. 1498; Gulf, C. & S. F. Ry. Co. v. Norfleet, 78 Tex. 321, 14 S. W. 703.

There is no complaint that the verdict is excessive by reason of the argument complained of. Appellee sued for several times more than she recovered.

■ Beginning with the eleventh proposition and continuing through several following, appellants submit that it was error, being hearsay, to admit as evidence the statements made by Newton to appellee and her mother.

We have already stated much of the testimony of appellee and her mother embraced in the several propositions, and we need not repeat the same here. Some statements of Newton more fully stated elsewhere are: Reason he could not take her to his parents' home: He told her to "run and hide"; "come on, honey, get our suitcases and put them in the car"; "he said he left me (in California) on account of his parents, because they disapproved of me;" "he told me that he would never have left me but for what they (appellants) wrote to him;" "said that his father and mother were the cause of his leaving her;" "said he left me on account of his parents; said, 'I don't care what they say, we will live together; I don't think I could make a living but I can try;'" said "he cried and said he was afraid we were going to have more trouble with them; said he was afraid his people saw me (Fort Worth) and that they would make him leave me again." Appellee said her husband had never contributed anything to her support after he left her; that her husband received letters from his father and mother which made him cry and worry. Mrs. Levy testified: After leaving appellants' home appellee cried, saying appellants had sent her husband away. Appellee testified: Newton said he would live with her if appellants would permit. Appellee's mother testified same as last above.

Appellants say in their brief that there is no Texas decision directly on the point presented, but refer to a few in other jurisdictions which hold the evidence admissible, such as Hardwick v. Hardwick, 130 Iowa, 230, 106 N. W. 639; Moir v. Moir, 181 Iowa, 1005, 165 N. W. 221; Gilbreath v. Gilbreath, 42 Colo. 5, 94 P. 23; Melcher v. Melcher, 102 Neb. 790, 169 N. W. 720, 4 A. L. R. 492, but submit that the weight of the authority is contrary to such holding.

The facts in the Hardwick Case are very similar to those here. The husband had abandoned the wife and the action was by the wife against her husband's father for inducing the abandonment. The wife had gone to her mother's home. On the trial the wife was permitted to state that her husband said to her that his father wanted him to leave her, her husband's disposition towards her, and how his statement of his attitude to her affected him. The court held that the statement of his father's wishes in the particular matter was a part of the matter described, and a declaration essential to give it meaning; that the declaration was a verbal act and tended to prove the effect of the father's influence exerted on the son, the issue being whether the father had wrongfully and maliciously induced the separation; that it was proper to show the declarations and acts of the father in respect to his son's marriage relation, and the way such declarations and acts caused him to treat his wife. Without stating the case at length, Moir v. Moir is in point and holds that the statement made by the husband that his father was insisting on him leaving her and was doing what he could to separate him and his wife, is admissible. The cases Gilbreath v. Gilbreath and Melcher

v. Melcher hold similarly to the above. The opinions in the above cases refer to other cases so holding. The inquiry here was whether Newton, the husband, had affection for his wife, and whether the appellants, by their acts and conduct, alienated such affection and thus brought about the abandonment. The conditions and facts are continuous and extend over a time from their first separation in California, down to and including their final separation after returning from Fort Worth. The inquiry here involves Newton's disposition toward, and his affection for appellee, and his declarations and conduct with reference to his parents' attitude toward appellee and Newton's relation toward and with appellee during the whole period.

The evidence strongly tends to show that Newton had affection for his wife; without quoting it, on more than one occasion he had with much feeling so expressed himself, and his acts disclosed it. His acts and conduct in California on receipt of letters from his parents, and his acts and conduct at Fort Worth on the arrival of his parents and while they were there, and on his arrival at Abilene, tend strongly to show his parents' attitude toward appellee, verbal acts without expression in words, and, as we think, part of the res gestæ of the matters under investigation. What he said to appellee and to appellee's mother at Abilene and at Fort Worth as to his acts, and as to his parents' attitude toward appellee, were parts of the continuous things said and done, and res gestæ. Some authorities and courts speak of such as original evidence. Appellee and her mother testified to practically the same conversations with appellants.

Mr. Greenleaf, vol. 1, § 102, p. 158, also in note one under same section, also in section 108 and 123, discuss the subject here as original evidence, and hold as admissible correspondence and declarations to third parties as to the cause of the separation.

Mr. Jones in his work on evidence, under the head of res gestæ, says' that: "Where emotions, feelings or state of the mind of third parties are to be proved the courts often permit their declarations as original evidence, although such statements have many of the elements of hearsay. This has often been illustrated to actions for the alienation of the wife's affections, and other actions where the state of the feelings has been relevant"—citing cases.

Volume 22 C. J. 279, states the general rule to be that, where the existence of a particular mental state in a particular individual is a relevant fact, his declarations are admitted as circumstantial evidence, and part of the res gestæ, and adds: "The effect of a certain influence on the mind of the declarant may be shown by his statements."

Jones' Commentaries on Evidence, quoting from a decision, says: "The declarations must be calculated to unfold the nature and quality of the facts which they are intended to explain; they must so harmonize with those facts as to form one transaction. There must be a transaction of which they are considered a part; they must be concomitant with the principal act, and so connected with it as to be regarded as the result and consequence of co-existent motives." Vol. 2, p. 825, par. 348.

We think the above, on the admissibility of the evidence, fits the facts in controversy. In view of all the facts in evidence, without repeating them in this connection, the abandonment of appellee by her husband at Abilene, on the return from Fort Worth, can hardly be explained, except on the theory explained by the declarations admitted. They are parts of and harmonize with the transaction extended, of which they are considered a part. It may be that some two or three statements of witnesses do not come within the rule announced, but we think they were competent as parts of the res gestæ.

We have concluded the evidence was properly admitted as circumstances tending to explain the abandonment, the truth of the declarations, and the weight to be given them being for the jury.

Appellants present a number of propositions submitting error to the exclusion by the court of the testimony of a number of witnesses offered as tending to show that the reputation of appellee, her mother, and a witness for appellee, for virtue and chastity, was bad. Appellants submit that the evidence was admissible on the issues of good faith in giving advice to their son, Newton, and in mitigation of damages.

Appellee objects to the consideration of the propositions and the assignments of error on which they are based on the ground that same are based on insufficient bills of exceptions, stating wherein the bills are insufficient. An inspection of the bills discloses that many of them are insufficient under the rules. Some of the propositions, we think, might be considered on the issue of good faith on the part of appellants in advising their son. We are now passing solely upon the sufficiency of the assignments and the propositions as being sufficient for consideration, and not upon the admissibility of the evidence offered.

Appellants offered to show by a number of witnesses that the reputation of appellee for virtue and chastity, prior to her marriage with appellants' son, was bad. The court excluded the tendered evidence of the several witnesses whose names are stated in the bills of exception. We have concluded that, if we may consider any one of the propositions, we may as well consider all on the issue of good

faith, grouping them, as they practically present the same question.

The one contention made by appellant under the several propositions is to the effect that the law gives to a parent the right, as long as the parent acts in good faith, to advise the child according to what the parent thinks is for the best interest of the child.

The question presented, as to the excluded evidence, seems to be, Does it tend to prove or disprove any issue in the case?

Appellee alleged certain acts and conduct on the part of appellants which appellee alleged to be wrongful and which show malice. Appellants deny that they did the acts complained of, and in their trial amendment specifically deny that they ever at any time advised or attempted to induce their son to abandon appellee, and pleaded in the alternative that, if their son left appellee on their advice, same was not willful, but was done in good faith and considered best for the welfare of their son. There is no suggestion or admission by appellee that she was of immoral character or that her reputation was that of a woman of immoral character; nor do appellants allege that appellee was a woman of immoral character, or that her reputation was such, nor do they in their alternative plea of acting in good faith even remotely suggest that, if their son left appellee on their advice, such advice was given because of any immoral character, or reputation of immoral character of appellee, as was offered to be shown by the excluded evidence.

Appellants denied repeatedly in their evidence that they at any time, by acts or words, did anything to alienate the affection of their son, or advised the abandonment. It would seem that, under the pleading and the evidence of appellants, to show that appellee was a woman of immoral character, or that her reputation was such, evidence of appellee's immoral character would not tend to show that appellants acted in good faith in giving their son advice, without alleging, and if not alleging, at least without proving, that they had some information or knowledge of appellee's immoral character, or her reputation as such, and that they acted upon such information or knowledge in giving advice.

We have found no Texas case in point. In White v. White, 76 Kan. 82, 90 P. 1087, 1089, plaintiff brought suit against her father-in-law to recover damages for alienating the affections of her husband and causing their separation. The court excluded evidence offered by the defendant tending to show the general reputation of the plaintiff for chastity at the time of the marriage. In disposing of the case the Supreme Court of Kansas said: "It is not alleged in the answer that the separation was caused by this fact, or even that it had ever come to the knowledge of the plaintiff's husband; nor did the defendant offer to show that this reputation had any influence whatever in causing the estrangement; and no evidence was offered which would justify such an inference. On the contrary, the testimony shows that the young couple lived happily together until the acts averred in the petition occurred. However unchaste a young woman may be before her marriage, if she and her husband afterwards live together in peace, affection and marital happiness, a third person cannot invoke her past conduct as a defense for maliciously wrecking the home and destroying her happiness. The evidence could have no legitimate purpose in the trial of the case, and was properly excluded."

Sutherland on Damages, vol. 4, pp. 4983, 4984, says: "Evidence of the plaintiff's reputation for chastity when married is immaterial if it had nothing to do in bringing about the separation from her husband. The bad character of the wife of plaintiff before marriage cannot be shown unless specially pleaded." Also, 30 C. J. p. 1126, par. 986, and note.

The husband of appellee testified that he knew appellee's bad habits before he married her, in fact was a contributing cause with her, and did it voluntarily because they wanted to, and he and his parents testified that his parents knew nothing of appellee's reputation before his marriage with her. We have concluded that to be a defense on the plea of good faith appellants must have known of the reputation of appellee and have acted in reference to such reputation, if they acted at all in inducing the separation, and that in the condition of the evidence the court was not in error in excluding the evidence referred to in the several bills of exception.

The thirty-seventh, thirty-eighth, thirty-ninth, and fortieth propositions are not properly briefed under the rules, and as to them appellee's objections are sustained.

The forty-first and forty-second propositions, we think, present no reversible error.

Finding no reversible error in the record, the case is affirmed.